James E. Cecchi
**CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

W. Daniel "Dee" Miles, III
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com

*Counsel for Plaintiffs and the Proposed Class
(additional counsel on signature page)*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAURA YOUNG, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>vs.<br><br>SUBARU CORPORATION, SUBARU OF AMERICA, INC., TOYOTA MOTOR CORPORATION, and TOYOTA MOTOR NORTH AMERICA, INC.,<br><br>                Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Laura Young ("Plaintiff") brings this action against Defendants Subaru Corporation and Subaru of America, Inc. (together "Subaru"), Toyota Motor Corporation and Toyota Motor North America Inc. (together "Toyota") (collectively "Defendants"), by and through her attorneys, individually and on behalf of all others similarly situated (the "Class," as more fully defined below), upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief and based upon investigation, alleging as follows:

## I.     INTRODUCTION

1.      This is a class action lawsuit brought by Plaintiff individually and on behalf of all others similarly situated who purchased or leased a 2013-2016 Scion FR-S, 2017-2023 Toyota 86/GR86, or 2013-2023 Subaru BRZ (the "Class Vehicles").[1]

2.      All Class Vehicles are equipped with four-cylinder boxer engines (the "Engine" or "Engines").

3.      The Engines suffer from low oil pressure and/or a loss of oil film, which starves the engines of oil, causing aggressive internal wear and damages internal engine components, ultimately leading to partial or complete engine failure and vehicle disablement (the "Engine Defect" or "Defect"). All Class Vehicles have the same or substantially similar Engine with the Engine Defect.

4.      The damage caused by the Engine Defect presents a safety risk to the Plaintiff and Class members because it causes a partial or total loss of motive power, affecting the Plaintiff's or Class members' ability to throttle and direct the vehicle. The Engine Defect also causes complete engine destruction, leaving it inoperable and unusable. In some instances, the Engine Defect could also cause engine fire.

5.      The Engine Defect often occurs at low mileage, within the warranty period and the useful life of the Engine.  Indeed, the low oil pressure and/or loss of oil film condition is manifest in every Class Vehicle at the original point of sale.

6.      Defendants admit they have known about the Engine Defect before the first Class Vehicle was sold from their routine pre-release testing intended to identify defects like the Engine

---

[1] Plaintiff reserves the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles.

Defect, which increasingly manifest over use and time. Such testing, would have, and likely did, reveal accelerated Engine wear, abnormal operating noise, and resultant failure, which alerted Defendants from the outset of the design defect or defect in workmanship and materials.

7.      Defendants also knew about the Engine Defect from numerous consumer complaints, warranty claims, customer complaints submitted by dealers, NHTSA complaints, and its own internal records.

8.      Nevertheless, Defendants have taken no action to correct the root cause of the Engine Defect in all Class Vehicles, regardless of whether its symptoms appear during or outside the limited warranty. The nature of the Engine Defect and its serious consequences as described herein were and are material to Plaintiff and any reasonable consumer.  Defendants had exclusive knowledge of the Engine Defect, yet chose to conceal it from purchasers.  Defendants have never disclosed the Engine Defect to Plaintiff or the Class members.

9.      Because of their exclusive knowledge of the Engine Defect, Plaintiff and Class members placed trust and confidence in Defendants to provide full disclosures of material aspects of the Class Vehicles, like the engine and its Engine Defect.  Instead, Defendants made misleading partial disclosures and material omissions in their advertising and marketing statements, Monroney stickers and websites, among other places, that did not include any information about the Engine Defect.

10.      Defendants have not recalled the Class Vehicles to repair the Engine Defect, nor have Defendants extended the warranty of Class Vehicles, offered customers a suitable repair or replacement, reimbursed consumers who incurred out-of-pocket expenses to repair the Engine Defect, compensated consumers for their overpayment for the vehicles due to the undisclosed defect, or compensated consumers for the diminished value caused by the Engine Defect.

11.     Had Plaintiff and other Class members known about the Engine Defect at the time of purchase or lease, they would not have purchased or leased their Class Vehicles or would have paid substantially less for them.

12.     As a result of Defendants' unfair, deceptive, and/or fraudulent conduct, Plaintiff and other Class members have suffered injuries in fact, incurred damages, and have been otherwise harmed by Defendants' conduct, including by paying a premium price for the vehicles due to the undisclosed defect, incurring costs associated with failures of their vehicles as a result of the Engine Defect and incurring costs associated with attempting to repair it.

13.     Accordingly, Plaintiff brings this action, individually and on behalf of the other Class members, to redress Defendants' common law violations, violations of the Magnuson-Moss Warranty Act, and violations of state consumer fraud and warranty statutes.

## II.     PARTIES

### A.     Plaintiff

14.     Plaintiff Laura Young is a citizen of Arkansas and resides in Greenwood, Arkansas.

15.     Plaintiff Young owns a 2019 Toyota GR86, which she purchased used on October 11, 2021 from Autowerks of NWA in Bentonville, Arkansas.

16.     Plaintiff Young's Class Vehicle was jointly designed, manufactured sold, distributed, advertised, marketed, and warranted by Defendants.

17.     Plaintiff Young purchased the Class Vehicle for her personal, family, or household use.

18.     Plaintiff Young expected her Class Vehicle to be of good and merchantable quality, safe, and not defective.

19.     Since the date of purchase, Plaintiff Young's Class Vehicle suffered from oil starvation and excessive internal friction, ultimately leading to catastrophic engine failure, despite her diligently maintaining her vehicle per the Defendants' written guidance.

20.     On or around April 15, 2023, Plaintiff Young while driving her vehicle in Fayetteville, Arkansas, experienced sudden loss of motive power and engine disablement. Plaintiff's Class Vehicle had accumulated approximately 64,000 miles at the time of failure.

21.     Plaintiff Young's vehicle was towed to her residence and inspected by The Car Clinic in Fort Smith, Arkansas in June of 2023. Upon a complete professional teardown of the engine, it was determined that the engine failure was due to oil starvation, loss of the oil film and excessive wear.[2]

22.     At presents, Ms. Young's vehicle is still disabled and Defendants have not replaced her defective engine with a non-defective one.

23.     Had Defendants disclosed the Engine Defect, Ms. Young would not have purchased her Class vehicle or paid significantly less for it.

24.     On October 5, 2023 and October 10, 2023, respectively, Ms. Young, through counsel, sent notice letters on behalf of herself and all other Class members to Defendants requesting relief and repair of the Defect. Defendants received the notice letters but did not respond.[3]

---

[2] *See* Exhibits A - D.

[3] *See* Exhibits E - F.

B.        **Defendants**

1.        **Subaru Corporation**

25.        Defendant Subaru Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan, in the Shibuya province, and is the parent company of Subaru of America, Inc.

26.        Subaru Corporation has purposefully availed itself of this jurisdiction by designing, manufacturing, marketing, distributing, and selling the Affected Vehicles in New Jersey, Arkansas, and throughout the United States.  Subaru Corporation has sufficient minimum contacts with this District by virtue of incorporating its subsidiary, Subaru of America, Inc., in this District. Moreover, Subaru Corporation directs and controls the activities of its subsidiary in this District.

2.        **Subaru of America**

27.        Defendant Subaru of America, Inc. ("SOA," and together with Subaru Corporation "Subaru") is a New Jersey Corporation with its principal place of business in Camden, New Jersey.

28.        SOA is a wholly-owned subsidiary of Subaru Corporation and serves as Subaru Corporation's sales and marketing agent in the United States. SOA is responsible for marketing, selling, distributing, and servicing the Class Vehicles in the United States, including New Jersey and Arkansas.

29.        At all relevant times, SOA acted as the authorized agent, representative, servant, employee and/or alter ego of Subaru Corp. while performing activities including but not limited to advertising, warranties, warranty repairs, dissemination of technical information and monitoring the performance of Subaru vehicles in the United States, including substantial activities that occurred within this jurisdiction.

30.        At all times relevant to this action, Defendants SOA and/or Subaru Corp. manufactured, distributed, sold, leased, and warranted the Class Vehicles under the Subaru brand

name throughout the United States. Defendants SOA and/or Subaru Corp. and/or their agents designed, manufactured, and/or installed the defective engine in the Class Vehicles. Defendants SOA and/or Subaru Corp. and/or their agents also developed and disseminated the owner's manuals and warranty booklets, USA Warranty and Maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.

31.     In this Complaint, when reference is made to any act, deed, or conduct of Subaru, the allegation means that Subaru Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the defendant.

32.     Subaru partially sells cars via communications that it authorized its dealers to make about Subaru vehicles, including the Class Vehicles discussed herein. This includes authorizing Subaru dealers to distribute brochures and other marketing and promotional material. Subaru, through its authorized dealers, has had the opportunity to disclose all material facts relating to the Class Vehicles.

### 3.     Toyota Motor Corporation

33.     Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation located at 1 Toyota-Cho, Toyota City, Aichi Prefecture, 471-8571, Japan. TMC is the parent corporation of TMNA. TMC has substantial control over TMNA, and TMNA acts for the benefit of TMC.

34.     At all relevant times, TMC acted in the United States by itself and through TMNA and its other various entities, including in Arkansas. TMC, itself and through TMNA and its other various entities, is in the business of designing, engineering, testing, validating, manufacturing, marketing, and selling Toyota branded vehicles throughout the United States, including within Arkansas and New Jersey.

35.     As further alleged below, TMC and TMNA worked together with the Subaru Defendants in New Jersey to design, manufacture, distribute, and sell the Class Vehicles.

### 4.     Toyota Motor North America, Inc.

36.     Defendant Toyota Motor North America, Inc. ("TMNA") is incorporated in California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024. TMNA is a wholly-owned holding company of sales, manufacturing, engineering, and research and development subsidiaries of Toyota Motor Corporation located in the United States.

37.     Toyota partially sells cars via communications that it authorized its dealers to make about Toyota vehicles, including the Class Vehicles discussed herein. This includes authorizing Toyota dealers to distribute brochures and other marketing and promotional material. Toyota, through its authorized dealers, has had the opportunity to disclose all material facts relating to the Class Vehicles.

38.     At all relevant times, TMNA acted as the authorized agent, representative, servant, employee and/or alter ego of TMC while performing activities including but not limited to advertising, warranties, warranty repairs, dissemination of technical information and monitoring the performance of Toyota vehicles in the United States, including substantial activities that occurred within this jurisdiction.

39.     At all times relevant to this action, Defendants TMC and/or TMNA manufactured, distributed, sold, leased, and warranted the Class Vehicles under the Toyota brand name throughout the United States. Defendants TMC and/or TMNA and/or their agents designed, manufactured, and/or installed the defective engine in the Class Vehicles. Defendants TMC and/or TNMNA and/or their agents also developed and disseminated the owner's manuals and warranty booklets, USA Warranty and Maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles

## III.    JURISDICTION

40.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists.

41.    Subject matter jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' Magnuson-Moss Warranty Act claim arises under federal law, and this Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

### A.    Subaru Defendants

42.    This Court has personal jurisdiction over the Subaru Defendants because SOA operates its headquarters and principal place of business in Camden, New Jersey, located in this District. Both Subaru Defendants have purposefully availed themselves of the privileges, benefits, and protections of this District by continuously and systematically conducting substantial business in this District. As detailed below, Subaru, itself and/or through its subsidiaries or agents, transacts business within the State of New Jersey and/or contracts anywhere to supply goods or services in New Jersey while obtaining substantial revenue in New Jersey, including by marketing, and selling the Affected Vehicles, as well as other products in New Jersey and providing repair services to the Affected Vehicles, and has injured Plaintiff and Class Members in New Jersey.

### B.    Toyota Defendants

43.    This court has personal jurisdiction over Toyota because Toyota conducts substantial business in this District and some of the actions giving rise to this litigation took place in this District and/or caused injury to property in this state; and products, materials, or things processed, services, or manufactured by Toyota anywhere were used or consumed in this state in

the ordinary course of commerce, trade, or use. Toyota is one of the largest manufacturers and sellers of automotive vehicles in the world. Toyota Defendants have, at all relevant times, conducted and continue to conduct business in New Jersey, and every other state in the country.

44.     More specifically, as further alleged below, Toyota and Subaru created a joint venture to design, manufacture, distribute, market, sell, warrant, and service the Class Vehicles all throughout the United States. Upon information and belief, a substantial part of that joint venture occurred in New Jersey through the activities of TMNA and SOA, acting as agents of TMC and Subaru Corporation, respectively.

45.     Moreover, Toyota, itself and/or through its subsidiaries or agents, maintains an interactive website that is accessible in New Jersey and from which it solicits business in New Jersey, including by directing consumers to Toyota dealerships in New Jersey and throughout the United States, and markets its brand and sells its products in New Jersey.

46.     Toyota, itself and/or through its subsidiaries or agents, disseminated and continues to disseminate television, radio, print, social media, and other forms of promotional and marketing materials from and/or in New Jersey, including material touting its Affected Vehicles. Through these various media outlets, Toyota, itself and/or through its subsidiaries or agents, disseminated statements that omitted material facts, made material misrepresentations and/or misleading statements and continues to do so, which damaged and continues to damage Plaintiff and Class Members in New Jersey and elsewhere, as alleged herein.

47.     Toyota, itself and/or through its subsidiaries or agents, operated dealerships in New Jersey at which salespersons marketed and sold Affected Vehicles to Class Members without disclosing material facts, made material misrepresentations/omissions and/or misleading

statements and continue to do so, which damaged and continues to damage Class Members in New Jersey and elsewhere, as alleged herein.

48.     TMNA is registered to do business in New Jersey and, according to Toyota's website, operates an office in New Jersey.

49.     Toyota, itself and/or through its subsidiaries or agents, purposefully availed itself of the privileges of doing business in New Jersey.

50.     Toyota, itself and/or through its subsidiaries or agents, has sufficient contacts with the State of New Jersey such that exercising jurisdiction over Toyota is reasonable and comports with due process.

## IV.     VENUE

51.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Plaintiff and Class members in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

## V.     FACTUAL ALLEGATIONS

52.     Defendants design, manufacture, market, and sell millions of vehicles within the United States and worldwide.

53.     Defendants have branded themselves as manufacturers of safe, dependable and robust vehicles, having spent millions, if not billions, of dollars on marketing and advertising campaigns to promote the safety reliability and longevity of their Toyota, Scion, and Subaru-branded automobiles, including the Class Vehicles.

**A.     The Joint Venture.**

54.     In 2008, Toyota and Subaru created a joint venture to design, manufacture, distribute, market, sell, warrant, and service the Scion FRS (a Toyota brand) and Subaru BRZ vehicles.

55.     Upon information and belief, Toyota and Subaru equally share the costs and profits of the joint venture.

56.     Upon information and belief, Subaru manufactures the vehicles, including the Engines, at their Ota-City, Gunma Prefecture, Japan facility and imports them to the U.S. for itself and Toyota.

57.     The first Class Vehicles entered the market in 2012 as the 2013 Subaru BRZ and the Toyota-branded Scion FR-S vehicles. These vehicles were equipped with a 2.0L boxer engine.

58.     In August 2016, Toyota discontinued its Scion brand. It continued to sell Class Vehicles manufactured pursuant to the joint venture as the Toyota 86.

59.     For the 2022 model year, Toyota and Subaru released the second-generation of the Class Vehicles. The Toyota variant was rebranded the GR86, and the vehicles are equipped with a 2.4L boxer engine.

60.     The 2.0L and the 2.4L are substantially similar four-cylinder boxer engines and suffer from the same design or manufacturing defects.

61.     Defendants together design, manufacture, distribute, market, sell, warrant, and service tens of thousands of Class Vehicles nationwide, all containing the Engines and suffering from the Engine Defect.

**B.     Intended Engine Operation.**

62.     The Engines at issue in this litigation are 2.0L and 2.4L four-cylinder boxer engines.

63.     As the image below reflects, the Engines here are horizontally opposed boxer engines rather than the traditional vertically opposed V or in-line engines.



64.     The Engines operate just like the traditional horizontal engine design: they are four-stroke engines that require fuel, air, and spark to initiate the combustion process and oil and heat mitigation to keep the internal, metal, rotating components lubricated and cooled.

65.     Like all internal combustion engines, if one of those key ingredients is missing, the engine will not operate as intended and can damage the engine.

66.     For example, engine oil develops a film on the Engine's cylinder walls that lubricates the Engine's rotating parts, reduces friction and carries away heat.

67.     Oil is circulated throughout the Engine by an oil pump. The pump pulls oil from the oil pan at one end and sends the oil through passages and galleys to the necessary engine components.

68.     Low oil pressure or a weak or absent oil film , will cause metal components to contact each other and wear.

69.     Critical engine component wear  leads to partial or total loss of engine motive power or complete engine disablement.

70.     All Class Vehicles are equipped with the same or substantially similar Engines.

**C.      The Engine Defect.**

71.     Defendants' deliberate selection of design and materials used, which were insufficient for engine longevity and reliability, created the Engine Defect that they knew about but never disclosed to purchasers. The Defective design and/or poor workmanship and materials caused the Engines to operate at low oil pressure levels with insufficient oil film distribution that failed to adequately lubricate critical engine components.

72.     According to Plaintiff's independent automotive consultant, the oil viscosity specified by Defendants is improper and damaging. Namely, the viscosity of oil used in the Class Vehicles is too low, which causes the thin oil film to break down in heavy throttle, high RPM, and high output running conditions – though the conditions were well within the Engine's typical and expected driving parameters.[4]

73.     Moreover, due to the inherent nature of the Engine's horizontal layout, the engine oil struggles to return to the oil pan and oil pickup and pump under normal driving conditions. Instead, the engine oil collects in the cylinder heads rather than circulating throughout the engine. Oil pooling reduces the amount of oil in circulation, which, in turn, reduces the oil film on critical components and ultimately reduces oil pressures.

---

[4] The Engines suffered aggressive wear and failure in ordinary driving conditions. High RPM operation in high ambient temperatures aggravated the Defect but was not a predicate factor.

74.     For this reason, Porsche (the only other large-scale OEM that uses a boxer engine) uses camshaft-driven oil scavenge pumps in the cylinder heads to return oil back to the sump and oil pickup and pump. However, here, the Engines lack these critical secondary oil return pumps.

75.     Also, boxer engines inherently have more mating surfaces to seal. Here, the Engines have at least 14 mating surfaces that must be sealed.  Mating surfaces are leak points for engine fluids like oil and coolant.

76.     Defendants sealed the Engine's mating surfaces with RTV silicone instead of using traditional gaskets.

77.     The heat created by the Engines hardens the RTV, making it prone to fracturing and migrating in the crankcase. For that reason, softer RTV should be used if RTV is used at all). Here, Defendants chose a thick Three Bond FIPG (Formed in Place Gasket) RTV that is a harder compound than the RTV Porsche uses to seal its boxer engine. For example, the Defendants' RTV measures 46 durometers while Porsche's RTV measures 36 durometers.

78.     Defendants also applied  RTV excessively and clumsily during the manufacturing process. For example, the RTV used on the oil Class Vehicle's oil pan is 6.00 mm thick, whereas a standard Toyota Camry only requires 3.5 mm of RTV on the oil pan.

79.      When torqued to specification with a 6.00mm bead, the RTV Defendants applied oozes into the internals of the engine.

80.     In sum, the result is an excessive amount of RTV exposed to the internal workings of the Engines that hardens due to engine heat, fractures, dislodges and works its way into oil and coolant passages, disrupting lubrication and heat exchange. Additionally, dislodged RTV enters the oil circulation, clogging oil passages, and reducing oil pressures. Plaintiff's independent

automotive expert tore down an Engine and observed RTV throughout the engine's internals, in particular the oil pickup pump's filter screen.

81.     Without ample oil flow, the oil pump starves and oil pressure declines. Oil pressure decline starves the Engine of adequate lubrication and heat mitigation. Loss of lubrication and heat mitigation causes the Engine's components to wear and break. When the Engine's components wear and break, the Engine is not useable.[5]

82.     In fact, as the pictures below reflect, Plaintiff's independent automotive consultant inspected a Class Vehicle's engine and observed critical engine components that were damaged or broken due to lack of oil pressure, oil film and resultant deficient lubrication and heat exchange:



_____

[5] These principles apply to all internal combustion engines, including the Engines in Class Vehicles.





83.     The Engine Defect strands Class members in all traffic conditions, and the Defect renders the vehicle's engine unusable, per voluminous complaints submitted to both NHTSA and online forums, both of which Defendants monitor to track product performance.

84.     The Defect occurs both in and out of warranty and is not remediable by any repairs performed by Defendants, their dealers, and/or agents.

85.     The nature and severity of the Engine Defect makes the Class Vehicles especially unreliable, unsafe, and unfit for their ordinary purpose.

86.     Plaintiff and Class members purchased or leased their Class Vehicles for the purpose, and with the understanding, of providing safe, reliable transportation.

87.     A vehicle suffering from the Engine Defect is unfit for its ordinary and intended purpose.

88.     As a result of the Defect, owners or lessors of Class Vehicles must either cease driving their Class Vehicles (the purpose for which they purchased them), or else risk a complete and total engine failure—and potentially causing or incurring serious bodily injury or property damage—every time they get behind the wheel.

89.     The Engine Defect substantially impairs the use, value, and safety of the Class Vehicles and renders them substantially less drivable, safe, useful, and valuable than they would be without the Defect.

90.     Defendants have also failed to implement a recall for the Class Vehicles to remedy the Defect, despite its serious risks, and likely has not done so in the interest of corporate profit. Rather, Defendants wait for Class members to experience this serious safety defect and report to its dealers.

91.     Defendants' failure and inability to repair the Engine Defect leaves the Plaintiff and Class members to be substantially likely to, and they do, experience complete engine failure and thus the Defect is left unremedied.

92.     Defendants' failure and inability to adequately repair the Defect and advise Plaintiff and Class members to stop driving their Class Vehicles leaves Plaintiff and Class members, vehicle occupants, and others on the road at risk of serious bodily harm and even death.

93.     Not only do Defendants fail to repair the damages resulting from the Engine Damage Defect, but they do not compensate Plaintiff and Class members for their overpayment or diminished value of their Class Vehicles.

**D.     Defendants Have Long Known About the Engine Damage Defect, But Failed to Disclose It**

94.     Defendants knew about the Engine Defect through consumer complaints made directly to Defendants, NHTSA, and/or posted on public online vehicle owner forums; its own investigations; pre-release testing; repair and replacement part sales data; and aggregate data from authorized Toyota and/or Subaru dealerships.

**1.     Pre-Release Testing**

95.     Prior to the sale of any of the Class Vehicles, Defendants – like any other reasonable Original Equipment Manufacturer (OEM) seeking to manufacture and sell vehicles on the U.S. market – completed a multitude of analyses and testing that exposed the existence of the Engine Defect, including most notably Failure Modes and Effects Analysis (FMEA) and Design Validation Plan and Report (DVP&R).

95.     The purpose of the FMEA is to define, based on known and established engineering facts like those asserted by Defendants, potential risks of failures and rank them by severity, likelihood and ability to detect failure.  Any conditions resulting in failure, like those associated

with the Engine Defect would result in a "high risk" priority and draw additional and more extensive analysis and validation testing during the FMEA and DVP&R phases. Given the later reports of failures after sale, these processes were designed to show the various modes of failure caused by the Engine Defect and confirm what Defendants already knew about the Engine Defect.

96.     For example, the DVP&R phase includes an extensive battery of tests and other work necessary to validate the robustness of any design, and includes three basic types of testing: bench scale, engine dynamometer, and vehicle/field testing, each to be discussed immediately hereafter.

97.     Bench scale testing is component-specific and establishes a strict set of specifications and guidelines to ensure that the component will operate reliably and durably in foreseeable operating conditions. During this phase of testing, Defendants' Engine was "bench tested," that is, set up on various machinery to simulate certain operating extremities and conditions to confirm whether it meets the necessary specifications and guidelines set by the supplier in coordination with Defendants. Discovery is expected to reveal that Defendants received the detailed results of the bench testing and resulting Technical Control Documents (TCDs) which outline the operating limitations of Defendants' engine along with the potential risks associated with installation in the Class Vehicles, including the Engine Defect.[6] Similarly, discovery is expected to show that bench testing of the Engine confirmed what Defendant already knew about its design choice or its workmanship and materials--that the Engine suffers from low oil pressure.

---

[6]   Defendant is in the exclusive possession of the specific information regarding each phase of testing, including the exact tests conducted and reports received from the testing. Plaintiffs make this allegation based on their own reasonable investigation of Defendants' procedures and the nature of the Engine Defect.

98.     Engine dynamometer testing is one of the most important types of testing to ensure durability and performance of the engine and its components.  In the engine dynamometer test, the Engine is operated under extreme conditions such as maximum temperatures, RPMs, or excessive vibration.  Engine dynamometer testing is intended to demonstrate engine robustness and reveal necessary improvements or flaws, such as the Engine Defect. Discovery is expected to confirm that engine dynamometer testing revealed that the oil pressure was lost and/or the oil film failed at high temperatures/RPMs.

99.     Finally, among other testing, Defendants tested the Engine in actual vehicles, both prototype vehicles and pre-production line vehicles.  In these tests, vehicles are driven through a full range of conditions and extremities that are encountered once a vehicle is sold to the public. These vehicle-specific development tests include mapping extreme engine operating conditions, which are the kinds of modes that manifest the Engine Defect.

100.     Through the rigors of these three phases of DVP&R testing, Defendants' Engine was exposed repeatedly to conditions that cause the Engine Defect to manifest.

101.     Defendants admit they perform extensive pre-release testing of the Class Vehicles before they are sold.[7]

102.     During this testing, Defendants learned that the Class Vehicles suffer from low oil pressure. However, due to the costs of redesigning and fixing the engine, Defendants opted to conceal the Engine Defect. In fact, Defendants admit they learned about the Engine Defect in the owners' manuals with its misleading, half-true statements that a different specified oil "may be

---

[7] https://www.maplewoodtoyota.com/research/new-car-testing.htm#:~:text=Toyota%20randomly%20selects%20completed%20engines,%2C%20pistons%2C%20valves%20and%20camshafts ; https://www.subaru.co.jp/en/csr/social/car_making/.

better suited" under "extreme conditions."  However, Defendants failed to disclose that a higher viscosity oil should be used in *all* driving conditions – not just "extreme."

103.    Defendants' knowledge is confirmed through a January 2019 recall (WTY-84R) for some vehicles with the 2.0L Engine, where they admitted they knew large pieces of RTV could break off and get "into the oil passages, restricting oil flow and potentially causing damage as shown here."

### 2.    NHTSA Complaints

104.    Another source of Defendants' knowledge are the complaints submitted by their customers to the National Highway Traffic Safety Administration ("NHTSA"). Defendants monitor customer complaints submitted to NHTSA pursuant to the TREAD ACT. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000). Defendants knew or should have known about the Defect and its associated risks through the numerous consumer complaints filed with NHTSA as early as 2018.

105.    An example of complaints submitted to NHTSA reflecting the Engine Damage Defect are copied below[8]:

> *REGARDING MY 2013 SCION FR-S VALVE SPRING RECALL. WHAT DO I DO WITH A CAR THAT, IF I DRIVE IT, THE ENGINE MAY SUFFER A CATASTROPHIC FAILURE; IF I TAKE IT TO THE DEALERSHIP FOR "REPAIR", THE ENGINE MAY SUFFER A CATASTROPHIC FAILURE? NORMALLY WHEN YOU PURCHASE A PRODUCT WITH A MAJOR DEFECT, YOU EXCHANGE IT FOR A NEW ONE. (THROWS UP HANDS) THIS IS IDIOCRACY. (7/17/2013, 2013 SCION FR-S, NHTSA ID: 11207295)

> I WAS DRIVING ON THE FREEWAY AND MY CAR STARTED TO SLOW DOWN. I PULLED OFF THE FREEWAY AND MY ENGINE KONKED OUT/DIED. FEELING UNSAFE TO DRIVE VEHICLE I HAD TO HAVE IT TOWED TO NEAREST MECHANIC. UPON HIS VISUAL INSPECTION AND

---

[8] All NHTSA complaints cited herein are verbatim copies of the complaints accessible on NHTSA's website. All typographical and grammatical errors are original.

BY STARTING IT UP HE HEARD A LOUD KNOCKING. THEN HE INFORMED ME THAT IT "POOPED A ROD BEARING" AND THAT I NEED A NEW MOTOR. HE MENTIONED A USED MOTOR GOES FOR $5000. I WAS SHOCKED TO HEAR THAT I NEEDED A NEW MOTOR AT 60,181 MILES. THEREFORE I HAD IT TOWED TO TOYOTA DELEARSHIP IN TUSTIN CALIFORNIA. AFTER RUNNING A DIAGNOSTIC AND DRAINING OIL FROM VEHICLE..THE MECHANIC SAID THERE WAS METAL PIECES IN THE OIL AND THAT THE MOTOR WAS DEFINITELY OIL STARVED. HE QUOTED A NEW ENGINE INSTALLATION WOULD BE $12,000. I CURRENTLY OWE $16,000 ON MY 2014 SCION FRS. I COULDN'T AFFORD IT SO I CONTACTED TOYOTA TO SEE IF IT WAS UNDER WARRANTY. THIS IS OBVIOUSLY A MANUFACTURER DEFECT BEING THAT THIS DOESN'T NORMALLY HAPPEN AT 60,000 MILES UNDER NORMAL DRVING CONDITIONS AND MAINTENANCE. TOYOTA DIDN'T HONOR MY WARRANTY BECAUSE IT WAS JUST OVER 181 MILES. (8/21/2018, 2014 SCION FR-S, NHTSA ID: 11133373)

AFTER RECEIVING MY CAR AFTER THE RECALL WAS PERFORMED, 15 MILES INTO DRIVING IT HOME MY ENGINE BEGAN TO KNOCK AND SLOW DOWN ON THE FREEWAY. THIS SAFETY RECALL PUT ME AT RISK. THE DEALERSHIP STATED THAT THEY WILL NOT COMPENSATE FOR THE PRICE OF A NEW ENGINE AND TRIED TO BLAME IT ON ME, COMPLETELY DISREGARDING ALL OF THE OTHER VEHICLES JUST LIKE ME AFTER THIS RECALL. I PURCHASED AN ENGINE ON MY OWN EXPENSE AFTER THAT OCCURRED, AND THAT ENGINE IS BAD. I CANNOT BELIEVE THIS TOYOTA DEALERSHIP ISN'T COMPENSATING LIKE OTHERS DID. (2/11/2019, 2013 SCION FR-S, NHTSA ID: 11192845)

ON FEBRUARY13, 2019, I TOOK MY CAR TO THE TOYOTA DEALERSHIP TO ADDRESS A RECENT RECALL TO FIX A VALVE SPRING. MARCH 5, MY CAR LOST POWER AND MADE A KNOCKING NOISE. MY CHECK ENGINE AND TRACTION CONTROL LIGHT WENT ON. I TOOK MY CAR BACK TO THE DEALERSHIP ON MARCH 5, THEY RESET THE CODE AND TOLD ME NOTHING WAS WRONG. ON THE WAY HOME, IT BROKE AGAIN. ON MARCH 6, THEY CHANGED THE EXHAUST VVT OIL CONTROL. ONE WEEK LATER, IT BROKE AGAIN. TODAY, MAY 31ST, THE ENGINE STALLED, I'VE LOST POWER AND THE CHECK ENGINE AND TRACTION CONTROL LIGHT CAME ON AGAIN. I AM THE ORIGINAL OWNER, SERVICE THE CAR REGULARLY AND HAVE NEVER HAD PROBLEMS UNTIL TOYOTA PERFORMED THIS RECALL. DOING RESEARCH ONLINE HAS SHOWN ME I AM NOT ALONE IN THIS COMPLAINT. ATTACHED IS A LINK WITH 72 OTHER OWNERS ALL REPORTING THE SAME PROBLEMS. HTTPS://DOCS.GOOGLE.COM/SPREADSHEETS/D/1SEL4X84CY_. (2/13/2019, 2013 SCION FR-S, NHTSA ID: 11217225)

ON JAN 26, 2019, I SEND MY 2013 FRS TO DO THE VALVE SPRING RECALL BY TOYOTA, WHICH LASTS ABOUT TWO WEEKS. AFTER ABOUT 200 MILES ADDED, I HEARD A COUPLE OF TIMES OF ABNORMAL NOISE FROM THE ENGINE, IT WAS LIKE RHYTHMIC KNOCKING. THEY HAPPENED RIGHT AFTER I STARTED THE ENGINE AND CAN BE CLEARLY NOTICED. THE NOISE BECAME WEAK IN ABOUT 1 MINUTE. IN ADDITION, I DROVE IT FOR ANOTHER 200 MILES AND THE AVERAGE MPG DECREASED FROM 34 TO 30. (2/17/2019, 2013 SCION FR-S, NHTSA ID: 11192481)

412.8 MILES AFTER HAVING J02 VALVE SPRING RECALL WORK PERFORMED, WHILE DRIVING, THE VEHICLE BEGAN MAKING A TICKING NOISE. WITHIN 2 MINUTES OF DRIVING, THIS ESCALATED TO LOUD METALLIC KNOCKING. I PULLED OVER IMMEDIATELY AND HAD MY VEHICLE TOWED TO THE DEALERSHIP THAT PERFORMED THE RECALL WORK. THAT WAS ON FEBRUARY 18TH, AT 9 AM IN 2019. MY VEHICLE HAS 53,610 MILES. IT IS NOW MARCH 8TH, 2019. THE DEALERSHIP STILL HAS TAKEN NO ACTION AFTER DETERMINING THAT ROD BEARING #4 WAS SPUN. I HAVE BEEN OFFERED NO RENTAL, I HAVE TO CALL MULTIPLE TIMES TO SPEAK WITH SOMEBODY. TOYOTA CUSTOMER CARE SAYS THAT THIS IS NOT A RECALL ISSUE, BUT A WORKMANSHIP FAILURE, AND TO WORK WITH THE DEALERSHIP. THE DEALERSHIP SAYS TO WORK WITH CUSTOMER CARE. AT THE DEALERSHIP, MY PARTS ARE ALL THROWN ON THE FLOOR, INCLUDING A BRAND NEW CLUTCH THEY HAD JUST INSTALLED. THERE IS NOW DIRT AND SALTWATER BEING KICKED ONTO MY PARTS THAT WOULD BE REUSED, AND IT'S INFURIATING TO SEE MY STUFF BEING TREATED THIS WAY. MY WIFE AND I HAVE BEEN HAVING TO SHARE OUR ONLY OTHER VEHICLE AND ARE SO TERRIBLY INCONVENIENCED THAT I AM LOSING SLEEP AND NOT EATING WELL. ALL I WANT IS FOR TOYOTA TO REPLACE THE ENTIRE ENGINE, OR COMPENSATE ME TO PAY ANOTHER FACILITY TO DO THE WORK. I HAVE AN ESTIMATE READY AND A SHOP WILLING TO DO THE WORK IMMEDIATELY. PLEASE HELP. (2/18/2019, 2013 SCION FR-S, NHTSA ID: 11185015)

REPLACE ENGINE VALVE SPRINGS RECALL POST SAFETY/ENGINE FAILURE. ENGINE FAILS AFTER BEING TAKEN INTO THE DEALERSHIP FOR RECALL. ON 02/18/2019 I TOOK MY SAFE, ENGINE ADEQUATLEY FUNCTIONING 2013 SCION FRS INTO JOHN ELWAY'S TOYOTA FOR A RECALL. IT WAS FOR THE REPLACEMENT OF VALVE SPRINGS. TWO DAYS LATER MY CAR STARTS MAKING A LOUD KNOCKING NOISE. THE CHECK ENGINE LIGHT TURNS ON AND MY CAR IS SHACKING WHILE I AM SITTING IN HEAVY TRAFFIC ON THE 91 FEEWAY.. DURING THE FEW TIMES I DID DRIVE MY VEHICLE I HEARD THE SAME TAPPING/KNOCKING NOISE SO APPROXIMATELY ON 03/14/2019 I TOOK

THE CAR BACK TO JOHN ELWAY TOYOTA FOR FURTHER EVALUATION OF MY CAR. THEY ASK TO KEEP MY CAR OVERNIGHT SINCE I COULD NOT POINT OUT THE NOISE WHEN I DROVE THE MECHANIC AROUND THE BLOCK.. FINALLY ON 04/10/2019 I TOOK MY CAR BACK TO JOHN ELWAY;S TOYOTA BECAUSE THE TAPPING/KNOCKING NOISE HAD BECOME A CONSTANT, CONSISTENT NOISE, VERY SIMILAR TO THE KNOCKING NOISE THAT BECAME LOUDER WHEN MY VEHICLE WAS TOWED, ALSO, THE CHECK ENGINE LIGHT HAD COME ON. IT WAS ABOUT TWO WEEKS BEFORE THEY TOLD ME THEY HAD COULD NOT FIND "ANYTHING WRONG WITH THE VECHILE BUT THE TAPPING CONTINUES, SO WE CALLED A GUY FROM OUR TORRANCE TOYOTA HEADQUARTERS TO COME TAKE A LOOK". I WOULD LIKE TO INFORM YOU THAT THIS TOYOTA SPECIALISTS REMOVED THE ENGINE FOR THE THIRD TIME TO DETERMINE WHAT WAS OCCURRING WITH MY VEHICLE. I CALLED MY TOYOTA ADVISER FOR UPDATES AND HE BASICALLY TOLD ME TO START LOOKING FOR A NEW CAR UNLESS I "ABSOLUTELY LOVED" MY CAR BECAUSE IT LOOKS LIKE I NEEDED A NEW ENGINE. FOR TWO WEEKS I COULD NOT GET AN ANSWER TO WHAT HAD ACTUALLY OCCURRED WITH MY VEHICLE AND MY CALLS WERE NO LONGER BEING TAKEN BY MY TOYOTA ADVISOR JEFF WADE. INSTEAD THEY WERE BEING DIRECTED TO JOSH REESE, SERVICE MANAGER. (2/18/2019, 2013 SCION FR-S, NHTSA ID: 11217227)

I HAD THE J02 VALVE SPRING RECALL DONE AND 2 WEEKS AND ROUGHLY 80 MILES LATER MY ENGUNE DEVELOPED A KNOCKING NOISE AND STARTED LOSING POWER THE DEALERSHIP THAT PERFORMED THE RECALL DENIED RESPONSIBILITY EVEN AFTER FINDING FIPG SEALENT IN MY OIL PICKUP. (2/19/2019, 2013 SCION FR-S, NHTSA ID: 1193172)

RECEIVED SAFETY RECALL NOTICE FROM TOYOTA, TO BRING MY CAR TO ANY TOYOTA DEALERSHIP SERVICE CENTER. THE RECALL IS FOR ENGINE VALVE SPRING REPLACEMENT. NHTSA RECALL NO. 18V-772 DEALERSHIP PERFORMS WORK. VEHICLE DIES WHILE COMMUTING TO WORK ABOUT 1,000 MILES AFTER RECALL WORK PERFORMED. VEHICLE TOWED BACK TO TOYOTA OF SANTA CRUZ. JUAN AND MIKE RELATE TO ME THAT THEY WILL TROUBLESHOOT AND, IF THEY DEEM THAT THE PROBLEM IS FROM THE RECALL WORK, THEY WILL FIX THE CAR FOR FREE. SEVERAL DAYS LATER, THEY SAID THE ENGINE HAS A SPUN BEARING ON THE #4 ROD. THEY STATE THAT THE FAILURE IS NOT DUE TO THE RECALL WORK THEY PERFORMED AND OFFER ME A USED, LOW-MILEAGE ENGINE FOR $7.5K, OR A NEW SHORT-BLOCK FOR $8.5K. I TOLD THEM THAT I DO NOT FEEL THAT I SHOULD PAY BECAUSE MY VEHICLE WAS IN PERFECT RUNNING ORDER BEFORE THE SERVICE, AND THAT MY

BEING BROKE DOWN ON A BUSY HIGHWAY PUT MY LIFE IN JEOPARDY. PROBLEM WAS ESCALATED TO TOYOTA CORPORATE, WHERE I TALKED TO BETH (CASE NR. [XXX]). SHE LATER TOLD ME THAT TOYOTA HAS DETERMINED THAT THE PROBLEM WAS NOT DUE TO THE RECALL PROCEDURE. AS OF 02/28/2019 - THERE ARE 12 CASES OF CUSTOMERS, NATION-WIDE, WHO HAVE BROUGHT THEIR 2012-2013 SCION FR-S IN FOR THE RECALL SERVICE AND HAVE EXPERIENCED THE SAME CATASTROPHIC ENGINE FAILURE AS I DID. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). *TT. (2/21/2019, 2013 SCION FR-S, NHTSA ID: 11183255)

BROUGHT THE CAR IN FOR VALVE SPRING RECALL, CAR CAME BACK WITH CLOGGED OIL PASSAGES. DAMAGED HEADS SUCH AS ROCKERS, CAMSHAFTS, INTAKE AND EXHAUST VALVES. RTV SEALANT FOUND IN OIL PAN AND OIL PICKUP. RTV IS BLOCKING OIL PASSAGES IN ENGINE CAUSING STARVATION. (2/22/2019, 2013 Subaru BRZ, NHTSA ID: 11196968)

TOYOTA DEALERSHIP IS NOT FOLLOWING RECALL PROCEDURE FROM TOYOTA CORP. AND THEY REFUSE TO DISCLOSE THE TECHNICIAN'S QUALIFICATION/CERTIFICATIONS. MY CAR WAS DROPPED OFF AT DEALER FOR J02 RECALL, ENGINE VALVE REPLACEMENT. AFTER THE RECALL SERVICE, I RECEIVED THE CAR WITH MULTIPLE PROBLEMS, EXHAUST LEAK, OIL LEAK, ENGINE KNOCK. HOWEVER, DEALERSHIP IS UNABLE TO DIAGNOSE THE PROBLEMS. SEALANT WAS APPLIED TO WRONG SPOTS ON THE ENGINE, CAUSING OIL LEAKS OR BLOCKAGE WHICH COULD RESULT IN ROD KNOCK. EXHAUST GASKETS AND OTHER GASKETS WERE NOT REPLACED, ALTHOUGH, THE REPAIR MANUAL SAYS TO REPLACE THEM. THE RECALL SERVICE QUALITY IS NOT BEING DOUBLE CHECKED BY ANOTHER TECHNICIAN, HOWEVER, SERVICE MANUAL CLEARLY STATES " AT LEAST ONE ASSOCIATE (SOMEONE OTHER THAN THE INDIVIDUAL WHO PERFORMED THE REPAIR) TO VERIFY THE REPAIR QUALITY OF EVERY VEHICLE PRIOR TO CUSTOMER DELIVERY". (2/26/2019, 2013 SCION FR-S, NHTSA ID: 11184465)

TL* THE CONTACT OWNS A 2013 SCION FR-S. THE CONTACT STATED THAT THE VEHICLE WAS REPAIRED PER NHTSA CAMPAIGN NUMBER: 18V772000 (ENGINE AND ENGINE COOLING). WHILE DRIVING APPROXIMATELY 65 MPH, THE VEHICLE STALLED AND ALL THE WARNING INDICATORS ILLUMINATED ON THE INSTRUMENT PANEL. THE VEHICLE WAS NOT ABLE TO RESTART. THE VEHICLE WAS TOWED TO DAYTONA TOYOTA (1700, 451 N NOVA RD, DAYTONA BEACH, FL 32114) WHERE IT WAS DIAGNOSED THAT THE SPUN ROD BEARINGS AND THE OIL PICK UP SCREEN WERE BLOCKED BY THE

SEALANT AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 100,000. (3/1/2019, 2013 SCION FR-S, NHTSA ID: 11219213)

BEFORE I TOOK MY CAR IN FOR RECALL I MADE SURE IT WAS IN TIP TOP SHAPE NO LEAKS OR NOISES OF ANY KIND, NO ISSUES WHATSOEVER! POST J02 VALVE SPRING RECALL CAR WAS RETURNED WITH A 1/2' HOLE IN EXHAUST MANIFOLD DEALER SAYS IT WAS MY FAULT ALTHOUGH IT HAPPENED WHILE IN THEIR POSSESSION IT WAS AT THAT TIME THE SHOP FOREMAN DECIDED NOT TO ADDRESS THE ENGINE SQUALLING AROUND 5K RPM AND INSTRUCTED ME TO FIX THE EXHAUST AND DRIVE IT. 3K MILES LATER I'M DRIVING DOWN THE ROAD 55MPH NORMALLY THE CARS STARTS BOGGING DOWN AND LESS THAN A MILE LATER STARTS KNOCKING VIOLENTLY AS I TURN AT AN INTERSECTION THE VEHICLE JUST DIES LEAVING ME QUICKLY EXITING THE VEHICLE TRYING TO PUSH IT OUT OF THE ROAD WITH THE HELP OF PASSING MOTORIST I FINALLY SUCCEEDED AFTER MY CAR HALF IN THE INTERSECTION SAT FOR 15 MIN BLOCKING TRAFFIC AND POTENTIALLY CAUSING ACCIDENTS. DEALER WANTED ME TO PAY FOR INVESTIGATION IF THEY DETERMINED I WAS AT FAULT. I DECIDED NOT TO LET THEM CONTINUE AND CHOOSE TO HAVE A PRIVATE REPAIR FACILITY INVESTIGATE WHAT CAUSED THE FAILURE. THEY DETERMINED THAT SEALANT HAD BEEN SUCKED INTO THE OIL PICKUP TUBE CLOGGING THE SCREEN ESSENTIALLY STARVING MY ENGINE OF OIL LEADING TO CATASTROPHIC FAILURE. THIS RECALL IS THE FIRST AND ONLY TIME MY VEHICLES ENGINE HAS BEEN WORKED ON LEADING THE PRIVATE REPAIR FACILITY TO DETERMINE THE DEALER AT FAULT WITH A PROBABLE CAUSE BEING CARELESSNESS REMOVING OLD SEALANT FROM ENGINE AND TIMING COVER. CURRENTLY BEING TREATED AS A LIAR BY DEALER WHILE PROVIDING THE FINDINGS FROM PRIVATE REPAIR FACILITY TRYING TO GET THEM TO FIX MY CAR. (3/2/2019, 2013 SCION FR-S, NHTSA ID: 11203651)

I HAD THE J02 RECALL WORK COMPLETED AT WALSER TOYOTA IN BLOOMINGTON, MN IN EARLY FEBRUARY 2019. 800 MILES LATER, I NOTE A TICKING NOISE WHILE EXITING THE FREEWAY. THE CAR STALLED REPEATEDLY AS I LIMPED THE CAR TO SAFETY AND HAD THE CAR TOWED TO THE DEALERSHIP. SIMILAR TO DOZENS OF OTHER OWNERS REPORTING ISSUE WITH ENGINE FAILURE AFTER THE J02 RECALL ON THE FT86CLUB.COM MESSAGE BOARDS, MY ENGINE SPUN A BEARING DUE TO OIL STARVATION. IT IS UNKNOWN IF THE ENGINE FAILURE IS POOR WORKMANSHIP OR A FAILURE WITH

THE RECALL PROCEDURE/PARTS. (3/14/2019, 2013 SCION FR-S, NHTSA ID: 11192364)

I WAS NOTIFIED BY MAIL THAT THEY'RE WAS A SAFETY RECALL FOR MY 2013 ACIOM FRS WHICH WAS TO REPLACE MY ENGINE SPRING VALVE AT NO COST. I TOOK IN MY CAR JANUARY 18 TO HAVE THE WORK DONE IT TOOK AROUND 2 WEEKS TO GET A RESPOND BACK THAT MY CAR WAS READY FOR PICK UP. I TOOK IT OUT AND DROVE IT FOR ABOUT 5 MILE TO GET GAS AND WHEN I TURNED ON MY CAR IT WAS STRUGGLING TO TURN ON AND ONCE IT TURNED ON IT WAS IT WAS SHAKING VIOLENTLY , 3 ENGINE CODES CAME UP P0017 P0300P219A. I TOOK IT IMMEDIATELY TO TOYOTA AND ALL THEY DID WAS CLEAR MY ENGINE CODES DROVE MY CAR FOR ABOUT 30 MILES AND HANDED IT BACK TO ME SAYING IT WAS SAFE TO DRIVE. I HAD MY CAR FOR ABOUT 2,000 MILES I WAS DRIVING BACK HOME AT NIGHT AND I HEARD A LOUD POP INSIDE MY ENGINE SO I PARKED THE CAR. THE NEXT DAY I WAS GOING TO MY FRIEND HOUSE TO CHANGE MY BRAKES AND WHILE I WAS ON THE FREEWAY I HEAD A SOFT ENGINE KNOCKING AND IT BECAME LOUDER AND LOUDER UNTIL THE ENGINE COMPLETLY DIED ON ME AND I WAS STRANDED. TOYOTA SEND A TOW TRUCK TO PICK UP MY CAR AND WHEN THEY INSPECTED THE ENGINE THEY SAID I HAD A CYLINDER THAT WAS DESTROYED AND A ROD BEARING DESTROYED AND THEY SAID IT WAS DUE TO 'OIL STARTVATION'. I'VE OWNED THAT CAR FOR A YEAR AND I HAVE NEVER HAD A SINGLE ISSUE WITH IT, UNTIL NOW THAT THEY WORKED ON MY ENGINE. THEY ARE TELLING ME I GOTTA PAY $8,600 OUT OF POCKET FOR A WHOLE NEW SHORT BLOCK AND THEY DON'T WANT TO TAKE RESPONSIBILITY FOR THE DAMAGES OCCUR AFTER THEIR WORK. (3/15/2019, 2013 SCION, FR-S, NHTSA ID: 11195026)

VALVE SPRINGS RECALL: WAS GETTING OFF THE FREEWAY, AND WENT TO TURN AND REALIZED MY CAR SHUT OFF (ALL LIGHTS ON), AND WOULDN'T TURN BACK ON (LIGHTS DISAPPEARED) , BUT GOT IT TO START AGAIN AFTER A COUPLE OF MINUTES, AND DIED AGAIN, AND HAPPENED 3 OR 4 TIMES AND IT WAS SPUTTERING / SHAKING AS IF IT WAS OUT OF GAS BUT MY GAGE WAS A LITTLE ABOVE A QUARTER AND PULLED INTO A GAS STATION 50 FT IN FRONT OF ME FILLED UP AND TURNED THE CAR ON, AND ABOVE 2000 RPM'S STARTS MAKING A HORRIBLE NOISE. I HAD THE RECALL DONE ON IT LAST MONTH (VALVE SPRINGS) , WHILE MY CAR WAS THERE MY VACUUM PUMP WENT OUT AND THE TECHNICIAN ONLY REALIZED AFTER PUTTING THE ENGINE BACK IN, AND ENDED UP TAKING THE WHOLE ENGINE APART AGAIN AND PUT BACK TOGETHER AND REALIZED IT WAS THE VACUUM PUMP, TRIED TO SEND ME ON MY WAY BUT ENDED UP TALKING TO A MANAGER WHO ATE THE COST AND OFF I WENT 3 OR 4 DAYS LATER DUE TO GETTING THE PART, NO ISSUES

SINCE THEN UNTIL NOW. WENT AND DID SOME RESEARCH AND COME TO FIND OUT OVER 40 OTHER HAVE HAD THE SAME ISSUE AS I HAVE AFTER THE RECALL AND IT TURNED OUT THAT TOYOTA HAD USED THE WRONG SEALANT OF SOME SORT AND NOW MY ENGINE HAS THROWN A ROD, AND THEY'RE MAKING ME PAY FOR IT! $5000-$7500 FOR THEIR MISTAKE!!! THE DEALERSHIP TOLD ME I HAVE TO REPLACE THE WHOLE SHORT BLOCK, OR REBUILD MY ENTIRE ENGINE. THEY SENT OUT ONE OF THEIR GM'S AND HE SAID THEY DID EVERYTHING RIGHT OBVIOUSLY NOT! I HAVE A SPREADSHEET OF 40 OTHERS THAT THIS HAS HAPPENED TO AS WELL AS 4 DIFFERENT NEWS ARTICLES REGARDING THE SAME ISSUES. I HAVE SPENT OVER 8 HOURS ON THE PHONE WITH EITHER TOYOTA OR THE DEALERSHIP ITSELF.                    NO                    HELP. HTTPS://WWW.FT86CLUB.COM/FORUMS/SHOWTHREAD.PHP?T=133521 HTTPS://WWW.THEDRIVE.COM/NEWS/26848/SCION-FR-S-SUBARU-BRZ-OWNERS-SAY-VALVE-SPRING-RECALL-FIX-IS-DESTROYING-THEIR-ENGINES HTTPS://DOCS.GOOGLE.COM/SPREADSHEETS/D/1SEL4X84C. (3/17/2019, 2013 SCION FR-S, NHTSA ID: 11192520)

I HAVE EXPERIENCED MAJOR PROBLEMS FOLLOWING THE VALVE SPRING RECALL ON THE SCION FR-S. APPROXIMATELY 1 MONTH FOLLOWING THE RECALL WHICH WAS COMPLETED IN MARCH, MY VEHICLE BEGAN EXPERIENCING A VIBRATION, A LOUD RATTLING SOUND, AND AN ENGINE KNOCK. I TOOK THE VEHICLE TO THE DEALERSHIP THAT COMPLETED THE RECALL TO HAVE THEM INSPECT IT. THE DEALERSHIP TRIED TO GIVE ME THE RUN AROUND, RON HUBBARD TOYOTA IN GALLATIN TN, EVENTUALLY I FOUGHT WITH THEM AND GOT THEM TO INSPECT IT. AFTER OVER A MONTH OF CALLING AND FIGHTING WITH THEM AND GOING TO THE DEALERSHIP THEY TOLD ME IT WAS A CRACKED FLEX PLATE CAUSING THE PROBLEMS AND TRIED TO CHARGE ME 1500$. AFTER MUCH FIGHTING AND CONTACTING TOYOTA HEADQUARTERS AND THE DEALERSHIP, I WAS PERSISTENT ENOUGH THAT THEY COVERED IT. BY NOW I HAD BEEN WITHOUT A VEHICLE FOR A MONTH AND HALF. I FINALLY GOT THE CAR BACK ABOUT TWO WEEKS AGO AND DROVE IT ONE TIME ALMOST 200 MILES TO RUN SOME ERRANDS. WELL THE VEHICLE EXPERIENCE THE SAME ENGINE RATTLE AND KNOCK BUT MUCH WORSE. I LIMPED THE VEHICLE BACK HOME. WHEN I STARTED IT UP FRIDAY TO TAKE IT BACK TO THE DEALERSHIP, IT WAS MUCH WORSE TO THE POINT THAT IT SOUNDED LIKE THE ENGINE WAS GOING TO FALL APART AND A VERY STRONG BURNING ODOR BEGAN TO EMIT FROM THE CAR. I WAS WORRIED FOLLOWING READING ABOUT OTHER PROBLEMS SO I IMMEDIATELY TURNED THE VEHICLE OFF AND CONTACTS MY INSURANCE COMPANY WHO TOWED THE VEHICLE TO THE DEALERSHIP. THIS HAS

BEEN THE WORST EXPERIENCE I'VE EVER DEALT WITH. (3/20/2019, 2013 SCION FR-S, NHTSA ID: 11209393)

LESS THAN 1000 MILES AFTER BRINGING MY CAR TO TOYOTA TO HAVE MANDATORY RECALL WORK PERFOMED INVOKVING VALVE SPRINGS, MY ENGINE DIED. THE ENGINE HAS A SPUN BEARING, LIKELY DUE TO OIL STARVATION. I WAS DRIVING ALONG THE HIGHWAY, AND WHEN I STOPPED FOR FUEL, I NOTICED A TICK THAT SOON BECAME A KNOCK. THE CAR WAS BOGGING DOWN ON IDLE AND ALMOST STALLED NUMEROUS TIMES. I DROVE IT TO A TOYOTA SERVICE CENTER THAT HAPPENED TO BE LESS THAN 2 MILES AWAY. (3/22/2019, 2013 SCION FR-S, NHTSA ID: 11193980)

ON MARCH 19TH 2019 I HAD THE J02 VALVE SPRING RECALL PERFORMED ON MY 2013 SCION FRS WITH 74,502 MILES ON THE ODOMETER. WORK WAS DONE BY WYATT JOHNSON TOYOTA OF CLARKSVILLE TN. I CHOSE THIS DEALER BECAUSE THE ALSO OWN A SUBARU DEALERSHIP. THEY ASSURED ME THAT THIS WAS THE 12TH FRS THAT THEY HAD PERFORMED THE RECALL ON WITH NO HISTORY OF PROBLEMS. I PICKED UP MY CAR 3 DAYS LATER WITH 74,505 MILES. I DROVE THE 100 MILES TO MY HOME VIA INTERSTATE 24, RUNNING AT 70-80 MPH. I NOTICED A TICKING NOISE AFTER AN HOUR OF DRIVING. BY DESTINATIONS END I HAD SEVERE RATTLING NOISE FROM DRIVERS SIDE OF ENGINE AND ROUGH IDLE. NOW WITH 294 MILES TOTAL SINCE REPAIR AFTER THE ENGINE IS RUNNING ROUGHER AND EMITTING SQUEALING AND RATTLING, ROUGH IDLE AND TRYING TO DIE. IT WAS SUGGESTED BY WYATT JOHNSON TOYOTA THAT I NOT DRIVE THE CAR TO THEM FOR INSPECTION RATHER TAKE IT TO MY LOCAL DEALER. I DELIVERED THE CAR TO COAD TOYOTA OF PADUCAH KY TODAY, APRIL 2ND 2019 WITH 74,801 MILES. I AWAIT THIER INSPECTION. THIS WAS A GREAT RUNNING ENGINE. NOW I SUSPECT IT IS ON THE VERGE OF FAILURE. I HAVE SUGGESTED DRAINING AND INSPECTING THE OIL FOR EVIDENCE OF UNUSUAL WEAR. (4/2/2019, 2013 SCION FR-S, NHTSA ID: 11193346)

MY CAR WAS BROUGHT IN FOR THE RECALL FOR THE FAULTY VALVE SPRINGS. AFTER ABOUT A MONTH AND A HALF THE ENGINE BEGAN KNOCKING. I TOOK IT BACK TO THE DEALER AND AFTER LOOKING AT THE ENGINE THEY WANTED RECORDS OF REGULAR VEHICLE MAINTENANCE. THEY WANTED THIS TO MAKE SURE MAINTENANCE WAS DONE BECAUSE TOYOTA CORPORATE SUGGESTED TO REPLACE THE WHOLE ENGINE . I CHANGE MY OWN OIL BUT KEEP TRACK OF THE MILEAGE AND DATE I CHANGED IT AND GAVE THAT TO THE DEALERSHIP TO SEND TO TOYOTA CORPORATE. THEY DENIED THE ENGINE WITH NO REASONING. (4/5/2019, 2013 SCION FR-S, NHTSA ID: 11197001)

I GOT A RECALL NOTICE FROM TOYOTA, AND TOOK IT IN FEBRUARY 2, 2019 FOR THE VALVE SPRING REPLACEMENT. I GOT MY CAR BACK FEBRUARY 12TH 2019 & AFTER LEAVE THE DEALER THAT DAY IT STARTED BOGGING, SO I RETURNED IT TO ELIMINATE THE SOUND THAT VERY NIGHT. AFTER RETURNING IT, I GOT MY CAR BACK FEBRUARY 13TH 2019 EVERYTHING APPEARED TO BE FINE UNTIL THIS PAST WEEKEND, APRIL 6TH I HEARD A POP IN THE ENGINE. I BEGAN TO HEAR KNOCKING COMING FROM THE MOTOR AND LOST POWER IMMEDIATELY WHILE ON THE FREEWAY, I TRIED TURNING IT ON BUT THE MOTOR WAS DEAD ALL LIGHTS ON THE DASH WERE ON. I WENT IN, IN ATTEMPT TO "FIX" MY CAR DUE TO THE RECALL NOTICE, WHICH HAS LEAD ME TO HAVE A COMPLETELY INOPERABLE CAR. (4/6/2019, 2013 SCION FR-S, NHTSA ID: 11194460)

I TOOK MY CAR IN FOR A RECALL REPAIR REGARDING REPLACEMENT OF THE ENGINE VALVE SPRINGS ON 1/8/19. THE CAR WAS READY FOR PICKUP TWO AND A HALF WEEKS LATER ON 1/25/19. AFTER EXACTLY TWO MONTHS, ON MARCH 8TH MY CAR BEGAN SHAKING AND WOBBLING WHILE I WAS DRIVING ON THE FREEWAY. WHEN THE CHECK ENGINE LIGHT TURNED ON AND I NOTICED MY CAR BEGAN SLOWING DOWN, I IMMEDIATELY PULLED OVER TO THE SIDE RIGHT SIDE OF THE HIGHWAY AS THE CAR SHUT OFF. AFTER I TRIED TURNING IT BACK ON, THE CAR WOULD TURN OFF AFTER A COUPLE SECONDS. I GOT THE CAR TOWED BACK HOME AND CONTACTED TOYOTA. THEY DID NOT PROVIDE A TOW TRUCK SO I HAD TO TOW IT IN FOR THEM TO INSPECT IT. IN THE FIRST UPDATE, THEY TOLD ME IT HAD SOMETHING TO DO WITH THE LUBRICATION ON THE SIDES OF THE ENGINE. DURING THE SECOND AND FINAL UPDATE THEY HAD A SECOND TECH COME IN FOR INSPECTION AND CONCLUDED IT WAS AN INTERNAL ENGINE FAILURE. I AM NOW IN WORSE SITUATION THAN BEFORE AND I FEEL LIKE I AM BEING CHARGED TO FIX SOMETHING THAT WAS NOT BROKEN IN THE FIRST PLACE. NOT TO MENTION THE ESTIMATE TO FIX AND INSTALL A BRAND NEW ENGINE WILL COST UP TO $11,000. I AM CURRENTLY AWAITING FOR A RESPONSES FROM CORPORATE. (4/8/2019, 2013 SCION FR-S, NHTSA ID: 11202565)

RECEIVED VAVLE SPRING RECALL NOTICE IN NOVEMBER AND READ UP ON THE RECALL, REALIZED IN JANUARY THERE WERE TONS OF FAILURES AFTER RECALL. HELD OFF UNTIL MARCH 1 WHEN I SAW NEW TRAINING HAD BEEN DONE. TOOK CAR IN FOR RECALL SERVICE TO NORTHRIDGE TOYOTA AT 100,1XX MILES. MARCH 12TH GOT THE CAR BACK. DROVE IT UNTIL APRIL 18TH NOTICED LIGHT KNOCKING NOISE, APRIL 19TH CAR STARTED SHAKING VIOLENTLY AT A STOP LIGHT. UPON ACCELERATING CAR STARTED HORRENDOUSLY

KNOCKING AND SCREECHING. HAD CAR TOWED BACK TO DEALER WITH 101,0XX MILES (LESS THAN THE MANDATORY 1200 MILE WARRANTY ON SERVICES TOYOTA HAS). TOYOTA STATES NOT RELATED TO RECALL, AND REQUESTS $2700 TO JUST TAKE THE ENGINE OUT AND LOOK AT IT. REP STATED MIGHT BE OIL RELATED AND SENT PHOTO OF OIL PAN WITH GOLDEN OIL IN IT (FROM RECALL) AND ABOUT A POUND OF METAL FLAKES. CONTACTED CORPORATE FILED A CLAIM AND AM AWAITING RESPONSE. ABSOLUTELY ABSURD THEY STILL HAVE THE NERVE TO SAY THIS ISNT RELATED WHEN SO MANY PEOPLE ARE HAVING THE SAME ISSUE. (4/18/2019, 2013 SCION FR-S, NHTSA ID: 11203245)

CATASTROPHIC ENGINE FAILURE, ON THE ROAD, AFTER PERFORMING THE REPAIR FOR THE J02 RECALL ON THE VALVE SPRINGS. DEALER WHO PERFORMED REPAIR WAS RELUCTANT TO HELP ME TOW MY VEHICLE TO THEIR SHOP. AFTER REACHING OUT TO CORPORATE HQ, THEY SENT A TOW TRUCK FOR MY CAR. THE DEALER VERY CLEARLY DID NOT APPRECIATE ME GOING OVER THEM AND STRAIGHT TO TOYOTA, BECAUSE THEY TREATED ME VERY POORLY ONCE I ARRIVED AT THEIR SHOP. I HAVE NOT RECEIVED ANY INFORMATION ON THE STATUS OF MY VEHICLE SINCE DROPPING IT OFF. MY ENGINE HAS LESS THAN 60K MILES ON IT, AND RAN BEAUTIFULLY BEFORE TAKING IT IN FOR THE RECALL. (4/18/2019, 2013 SCION, FR-S, NHTSA ID: 11203794)

FOLLOWING THE J02 RECALL WORK MY 2013 FRS WAS PICKED UP AND BROUGHT TO ME 4.1 MILES AWAY WHEN I GOT OFF WORK AND STARTED MY VEHICLE I NOTICED A TICKING SOUND COMING FROM THE BACK PASSENGER SIDE OF THE ENGINE. UPON ACCELERATION THERE IS A DISTINCT KNOCKING COMING FROM THE ENGINE, SINCE THEN I HAVE DRIVEN 12.7 MILES INCLUDING THE DISTANCE BACK TO THE DEALER WHERE THE VEHICLE IS ONCE AGAIN. THERE ALSO APPEARS TO BE WAY TOO MUCH SEALANT APPLIED TO THE ENGINE WHEN THEY PUT IT BACK TOGETHER. (4/22/2019, 2013 SCION FR-S, NHTSA ID: 11203384)

THE VEHICLE (2013 SCION FR-S, 69000 MILES) WAS IN A FACTORY AUTHORIZED SERVICE CENTER [XXX] TO HAVE RECALL J02 (NHTSA RECALL CAMPAIGN 18V772000) PERFORMED. WE WERE NOTIFIED THAT THE CAR SUFFERED A MAJOR ENGINE PROBLEM FOLLOWING THE RECALL SERVICE, BUT BEFORE THE CAR WAS RETURNED TO US. THE DESCRIPTION OF THE CIRCUMSTANCES INVOLVED INDICATED THAT THE CAR WAS ON A TEST DRIVE FOLLOWING THE COMPLETION OF THE RECALL SERVICE AND REQUIRED TOWING BACK TO THE SERVICE CENTER. WE WERE INFORMED OF THIS TWO DAYS AFTER ITS OCCURRENCE. A VISUAL OBSERVATION OF THE PARTIALLY

DISASSEMBLED ENGINE INDICATES LIKELY OIL STARVATION AS THE CAUSE OF THE PROBLEM. AT THIS POINT IN TIME, THE SERVICE CENTER HAS RETAINED THE VEHICLE AND PARTS PENDING A DETERMINATION BY TOYOTA. AT THIS POINT IN TIME, THE SERVICE CENTER IS OF THE OPINION THAT A NON-FACTORY OIL FILTER CAUSED OIL STARVATION. THE OIL FILTER HAD BEEN INSTALLED ON THE CAR AND FUNCTIONING APPROPRIATELY FOR APPROXIMATELY 3500 MILES PRIOR TO THE SERVICE. THE OIL FILTER WAS NOT REPLACED DURING THE ENGINE OUT SERVICE WHICH REQUIRED REPLACEMENT OF INTERNAL ENGINE COMPONENTS. WE WERE NOT NOTIFIED DURING THE 9 DAYS THAT THE SERVICE CENTERED HAD POSSESSION OF THE CAR PRIOR TO THE PROBLEM THAT THERE WERE ANY CONCERNS RELATED TO THE OIL FILTER - THE MAKE AND MODEL OF THE OIL FILTER HAS ONLY BECOME A POINT OF DISCUSSION AFTER OIL STARVATION OCCURRED. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). *TR. (4/26/2019, 2013 SCION FR-S, NHTSA ID: 11204145)

VEHICLE WAS IN DEALERSHIP (TOYOTA OF REDLANDS, REDLANDS CA) FOR THE F02 VALVE SPRING RECALL. UPON RECIEVING THE VEHICLE BACK FROM THE DEALERSHIP THE ENGINE WAS TICKING MORE THAN USUAL. 700 MILES LATER IT SPUN A BEARING RESULTING IN TOTAL ENGINE FAILURE. CAR WAS TOWED BACK TO DEALERSHIP FOR INSPECTION, THEY DEEMED IT NOT THEIR FAULT AND WANTED TO STICK A 8K-12K BILL ON ME TO MOVE ON WITH REPAIRS. SMALL AMOUNTS OF SEALANT WERE FOUND ON PICKUP SCREEN. CAR RAN FLAWLESSLY FOR 97K PRIOR TO RECALL WORK. (5/1/2019, 2013 SCION FR-S, NHTSA ID: 11205052)

TL* THE CONTACT OWNS A 2013 SCION FR-S. WHILE DRIVING 65 MPH, THE VEHICLE STALLED AND THE CHECK ENGINE AND TRACTION CONTROL WARNING INDICATORS ILLUMINATED. THE CONTACT PULLED THE VEHICLE OVER AND HAD IT TOWED TO KENDALL TOYOTA OF EUGENE (373 GOODPASTURE ISLAND RD, EUGENE, OR 97401, (541) 228-9004) WHERE IT WAS DIAGNOSED THAT METAL FRAGMENTS WERE INSIDE THE OIL PAN. THE VEHICLE HAD NOT BEEN REPAIRED. THE MANUFACTURER WAS NOTIFIED. THE FAILURE MILEAGE WAS 57,000. (5/10/2019, 2013 SCIO FR-S, NHTSA ID: 11208130)

TL* THE CONTACT OWNS A 2013 SCION FR-S. WHILE DRIVING, A KNOCKING NOISE WAS HEARD FROM THE ENGINE COMPARTMENT. THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT COASTED THE VEHICLE OVER TO THE SIDE OF THE ROAD AND POWERED OFF THE ENGINE. THE VEHICLE FAILED TO RESTART AND WAS TOWED TO REINHARDT TOYOTA (LOCATED AT 911 EASTERN

BLVD, MONTGOMERY, AL 36117, (334) 272-7147) WHERE IT WAS DIAGNOSED THAT METAL SHAVINGS WERE INSIDE THE OIL PAN. THE CONTACT STATED THAT THE VEHICLE REMAINED AT THE DEALER FOR SIXTEEN DAYS AND WAS NOT REPAIRED. THE CONTACT ALSO STATED THAT THE VEHICLE WAS PREVIOUSLY REPAIRED PER NHTSA CAMPAIGN NUMBER: 18V772000 (ENGINE AND ENGINE COOLING). THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 16,000. (5/10/2019, 2013 SCION FR-S, NHTSA ID: 11210819)

I BROUGHT MY 2013 SCION FR-S IN FOR THE ENGINE SPRING RECALL TO AUTONATION TOYOTA PINELLAS, FL WITH 37,800 MILES ON IT.. THE CAR HAD BEEN RUNNING PERFECTLY PRIOR TO THIS. ABOUT 900 MILES LATER, I HEARD A KNOCKING AND, AT FIRST, THOUGHT IT HAD SOMETHING TO DO WITH THE SERPENTINE BELT. I THEN BROUGHT IT TO MY LOCAL MECHANIC (SINCE I LIVE OVER AN HOUR AWAY FROM WHERE THE RECALL WAS PERFORMED) AND HE SAID MY ENGINE WAS BLOWN DUE TO ROD BEARING, CONNECTING RODS AND MAIN BEARINGS. HE SAID IT LOOKED LIKE METAL OR SOMETHING WAS CARRIED THROUGH THE ENGINE VIA THE OIL. I THEN TOOK IT TO MY LOCAL SUBARU DEALER (SINCE IT HAS A SUBARU BOXER ENGINE) AND THEY SAID THE EXACT, SAME THING. I HAVE BEEN WITHOUT A CAR FOR THREE MONTHS, SPENT A FORTUNE ON RENTALS UNTIL I RAN OUT OF MONEY AND LOST MY $50,000/YEAR JOB OVER IT AS A PROPERTY MANAGER BECAUSE I NEEDED A CAR TO FUNCTION. I NO LONGER HAVE THE OPTION OF BUYING ANOTHER CAR BECAUSE I'VE LOST MY JOB AND IT'S PRETTY HARD TO GET ANOTHER ONE WITHOUT A VEHICLE. IF TOYOTA DOES NOT STEP UP TO THE PLATE, OFFER ME A LOANER VEHICLE, AND FIX THIS CAR, I WILL BE SEEKING LITIGATION ON THIS ISSUE. I HAVE ALREADY HIRED A LAWYER BUT, I WAS HOPING TOYOTA WOULD DO THE RIGHT THING. (5/14/2019, 2013 SCION FR-S, NHTSA ID: 11231551)

+1000 MILES POST ENGINE-SPRING RECALL. RETURNING HOME ON A 134 MILE TRIP. PRIMARILY HIGHWAY/EXPRESSWAY. VEHICLE IN MOTION: AFTER REFUELING, A QUIET, RHYTHMIC KNOCKING SOUND APPEARED DURING ACCELERATION. WITHIN 5 MILES, THE SOUND BECAME INCREASINGLY LOUDER. DEFINITELY A 'METAL-ON-METAL' TYPE OF NOISE. MINUTES LATER, OIL LIGHT BEGAN TO FLICKER, FOLLOWED BY CHECK-ENGINE LIGHT AND LOSS OF TRACTION INDICATOR. NO CHANGE IN TEMPERATURE OR FUEL QUANTITY. NO CHANGE IN PERFORMANCE, HANDLING OR DRIVING CONDITION. DECREASED SPEED (DOWNSHIFTING), TO PULL OF TO SIDE OF ROAD AND THE ENGINE STALLED. PARKED AND CHECKED UNDER HOOD; NO SMOKE, SMELL OR ANYTHING OUT OF THE ORDINARY. WAS ABLE TO RESTART AFTER MULTIPLE ATTEMPTS TO EXIT THE HIGHWAY

AND PULL TO A SAFER LOCATION TO CALL TOYOTA ROADSIDE ASSISTANCE. WAS PICKED UP ON A FLATBED AND DELIVERED TO TOYOTA OF NAPERVILLE WHERE THE RECALL WORK HAD BEEN PERFORMED MONTHS EARLIER. I WAS INFORMED THAT THERE IS METAL IN THE OIL/OIL-PAN, EXTREMELY MUDDY OIL AND THAT A SENIOR TECH WILL BE VISITING TO FURTHER ASSESS. THERE IS A POSSIBILITY OF ENGINE-REPLACEMENT. AWAITING FURTHER INFORMATION. NOTE: ALL RECOMMENDED, SCHEDULED MAINTENANCE HAVE BEEN PERFORMED DURING OWNERSHIP. (5/19/2019, 2013 SCION FR-S, NHTSA ID: 11209098)

TL* THE CONTACT OWNS A 2013 SCION FR-S. THE CONTACT STATED THAT THE VEHICLE WAS REPAIRED PER NHTSA CAMPAIGN NUMBER: 18V772000(ENGINE). MOMENTS AFTER RETRIEVING THE VEHICLE, THE CHECK ENGINE INDICATOR ILLUMINATED, A KNOCKING NOISE WAS HEARD, AND THE VEHICLE STALLED. THE VEHICLE WAS TOWED BACK TO THE LOCAL DEALER (STERLING MCCALL FORT BEND TOYOTA, 20465 SW FREEWAY, RICHMOND, TX) WHERE IT WAS DIAGNOSED THAT THE ENGINE FAILED AND NEEDED TO THE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND DID NOT ASSIST. THE FAILURE MILEAGE WAS 92,000. THE CONSUMER STATED AFTER HAVING THE VEHICLE REPAIRED THE VEHICLE CONTINUED TO EXPERIENCE THE FAILURE IMMEDIATELY AFTER LEAVING THE DEALER. THE FAILURE RESULTED IN THE ENGINE COMING TOTALLY APART UNDER THE HOOD. THE DEALER SENT A TECHNICIAN TO INSPECT THE VEHICLE AND ADVISED THAT THE FAILURE WAS A CONSEQUENCE OF THE HAVING THE RECALL COMPLETED. THE DEALER REFUSED TO ASSUME RESPONSIBILITY FOR THE FAILURE AND WOULD NOT ASSIST WITH THE COST OF REPAIRS. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND DID NOT OFFER ANY ASSISTANCE. *JS. (5/20/2019, 2013 SCION FR-S, NHTSA ID: 11217065)

IN MARCH 2019 I TOOK MY CAR INTO SUBARU FOR A FACTORY RECALL ON THE VALVE SPRINGS. THEY DID THE WORK AND I RECEIVED MY CAR BACK ABOUT TWO WEEKS LATER. ABOUT TWO MONTHS AFTER THAT MY CAR DIED WHILE DRIVING ON A HIGHWAY FOR NO APPARENT REASON. I CALLED SUBARU AND TOLD THEM WHAT HAPPENED AND THAT I THINK SOMETHING WENT WRONG DUE TO THE RECALL WORK THEY DID ON MY VALVE SPRINGS. THEY ASSURED ME IT HAD NOTHING TO DO WITH THE WORK THEY DID BUT THAT THEY WOULD INSPECT MY VEHICLE. AFTER RETURNING THE CAR TO THE RETAILER THAT WORKED ON IT PREVIOUSLY I WAS TOLD THAT I NEEDED TO PURCHASE A NEW SHORT BLOCK BECAUSE OF "OIL STARVATION IN CYLINDER 3" AND THAT NOTHING WAS WRONG WITH THE TOP END OF THE ENGINE WHERE THEY WORKED

AT PREVIOUSLY. I AUTHORIZED THE WORK AND THEY DID NOT GIVE ME A RENTAL/ LONER VEHICLE FOR THE TWO MOTHS THEY HAD MY CAR WORKING ON IT. I PAID THE $2,311.25 TO GET MY CAR BACK AND BEFORE I DROVE IT OFF THE LOT THE CAR HAD A CHECK ENGINE LIGHT ON. I TOOK IT BACK AND TOLD THEM MY CAR WAS NOT FIXED. SINCE, THEY TOLD ME THAT THE CAM SPROCKET WENT BAD ( IN THE TOP END OF THE MOTOR WHERE THEY SAID THEY INSPECTED AND EVERYTHING WAS FINE BEFORE ) AND THAT I MAY NEED A NEW ECU. I CALLED SUBARU CORPORATE AND STARTED A CLAIM WITH THEIR CUSTOMER SERVICE DEPARTMENT FOR SOME HELP BUT THAT GOT ME NOWHERE AND IT HAS BEEN DIFFICULT GETTING ANY INFORMATION FROM THE SERVICE DEPARTMENT IN CHARGE OF FIXING MY VEHICLE. I DID SOME RESEARCH AND FOUND THAT I AM NOT THE ONLY ONE WHO HAS SUFFERED CATASTROPHIC ENGINE FAILURE AFTER THE FACTORY RECALL ON THE VALVE SPRINGS WHICH LEADS ME TO MAKING A COMPLAINT WITH THE NHTSA 3 MOTHS AFTER I TOOK MY CAR BACK TO GET SERVICED. 5/28/2019, 2013 Subaru BRZ, NHTSA ID: 11243772)

SUBARU VALVE SPRING RECALL. TOYOTA DID THE RECALL FOR VALVE SPRINGS ON MY 13 SCION FRS. TOO MUCH SEALANT WAS USED AND IT CAUSED THE ENGINE TO SPIN A BEARING. MY WARRANTY IS EXPIRED AND IT WILL BE 6000$ TO REPLACE THE ENGINE. TOYOTA HAS NOT GOTTEN BACK WITH ME ON ADMITTING THE RECALL CAUSED THE BLOWN ENGINE. HOWEVER THERE ARE ALOT OF FRS THAT HAVE HAD THIS ISSUE DUE TO THE RECALL AND TOO MUCH SEALANT. I WAS DRIVING DOWN THE HIGHWAY AND THE CAR DIED AND WOULD NOT START AGAIN. HAD TO HAVE IT TOWED TO TOYOTA. (6/11/2019, 2013 SCION FR-S, NHTSA ID: 11221443)

7,500 MILES AFTER COMPLETION OF SAFETY RECALL J02 THE VEHICLE BEGAN MAKING A LOUD KNOCKING NOISE AND SHUT OFF UNEXPECTEDLY WHILE IN THE FAST LANE ON 285W IN ATLANTA. NO CHECK ENGINE LIGHT OR WARNING WAS GIVEN PRIOR TO SHUT OFF. THE DEALERSHIP HAS INVESTIGATED AND DETERMINED THAT THE #4 ROD BEARING IS DESTROYED. I HAVE KEPT UP WITH ALL RECOMMENDED MAINTENANCE AND HAD NO ISSUES WITH THE CAR PRIOR TO THE RECALL. THE CAR HAS ROUGHLY 90,000 MILES AND WAS RUNNING WELL BEFORE THE RECALL AND HAD BEEN WELL TAKEN CARE OF. THIS RECALL HAS CAUSED ISSUES IN NUMEROUS OTHER FR-S AND BRZS, MOST OF WHICH HAVE RESULTED IN A DESTROYED ROD BEARING DUE TO RTV SEALANT BLOCKING OIL CHANNELS. DEALERSHIP IS DENYING RESPONSIBILITY BUT HAS NOT IDENTIFIED THE CAUSE OF THE FAILURE. (6/14/2019, 2013 SCION FR-S, NHTSA ID: 11222726)

MY SUBARU BRZ WAS RECALLED FOR VALVE SPRINGS. I DROPPED OFF MY SUBARU ON JUNE 24TH FOR THE REPAIR. I WAS TOLD IT WOULD TAKE A FEW DAYS BUT THE CAR WAS NOT READY FOR PICK UP UNTIL SATURDAY JULY 20TH. WHEN I PICKED UP THE CAR I WAS CHARGED $33.00 FOR OIL FILTERS. WHEN I DROVE THE CAR OUT OF THE PARKING LOT THE CAR HAD NO POWER AND THERE WAS A NOISE COMING FROM THE CAR. I BROUGHT THE CAR BACK TO THE DEALER AND THEY SAID THAT THEY WOULD HAVE TO KEEP IT. IT IS NOW TUESDAY JULY 23RD AND I HAVE NO UPDATE AS TO WHAT IS WRONG WITH THE CAR OR WHEN IT WILL BE REPAIRED. (6/24/2019, 2013 Subaru BRZ, NHTSA ID: 11234061)

I TOOK MY CAR IN FOR THE SAFETY RECALL J02 VALVE SPRINGS REPLACEMENT. ABOUT 5000 MILES OR SO LATER MY VEHICLE SHUT OFF UNEXPECTEDLY WHILE I WAS ON THE INTERSTATE. LUCKILY I WAS ABLE TO CROSS TRAFFIC AND EXIT WITHOUT CAUSING INJURY. MY VEHICLE WAS TOWED TO THE DEALERSHIP. THEY SAID THEY FOUND METAL SHAVINGS IN THE OIL PAN SO THEY LOOKED FURTHER AND DETERMINED A ROD BEARING HAD SEIZED. THERE HAS NOT BEEN ANY ISSUES WITH MY ENGINE PRIOR TO THE RECALL AND I HAVE KEPT UP WITH VEHICLE MAINTENANCE. MY CAR NO LONGER HAS A WARRANTY AND THE DEALERSHIP SAID I WOULD HAVE TO PAY OUT OF POCKET FOR AN ENGINE REPLACEMENT. THERE ARE NUMEROUS COMPLAINTS AND ARTICLES ONLINE STATING ROD BEARINGS HAVE BEEN DESTROYED POST RECALL. THIS IS A RESULT OF TOO MUCH SEALANT APPLIED DURING THE RECALL, CAUSING EXCESS TO BLOCK OIL CHANNELS. (6/27/2019, 2013 SCION FR-S, NHTSA ID: 11231572)

THE ENGINE IS MAKING A RATTLING NOISE WHENEVER I TRY STARTING THE CAR AND IT DIES AFTER 30 SECONDS. THE RATTLING NOISE STARTED HAPPENING ONLY AFTER 2 MONTHS OF BUYING THE CAR. THE NOISE SPECIFICALLY STARTED HAPPENING AFTER I WAS DRIVING IT FROM WORK AND AFTER TAKING A U-TURN, A RATTLING NOISE JUST STARTED GROWING LOUDER AND LOUDER UP UNTIL IT JUST SLOWLY DIED AND I HAD TO PULL OVER TO THE SIDE OF THE STREET. (7/7/2019, 2013 SCION FR-S, NHTSA ID: 11232198)

CAR WAS RECALLED FOR REPLACEMENT OF VALVE SPRINGS AND THIS SERVICE CAUSED ENGINE FAILURE(BEARING) PROBABLY SEALANT SEEPED INTO OIL CAUSING BLOCKAGE OF OIL FLOW. (7/12/2019, 2013 SCION FR-S, NHTSA ID; 11234598)

TOOK THE CAR IN FOR THE VALVE RECALL AND WITHIN A FEW THOUSAND MILES IT STARTED TO HAVE A VERY BAD KNOCK WE WERE DRIVING WHEN THE KNOCK STARTED AROUND 50.. TOOK IT

BACK TO THE DEALER. THEY PULLED THE OIL PAN AND WAS TOLD THAT IT HAD A BAD ROD BEARING. WE ARE ALWAYS UP ON THE OIL SERVICE. ONLY 1500 MILES OUT OF WARRANTY WITH NO HELP FROM TOYOTA. I CAN'T BELIEVE THEY WON'T HELP OUT. TOYOTA IS JUST DITCHING THIS PROBLEM. TO MANY OF THE SAME ISSUES WITH THE SAME RECALL AND PROBLEMS. (7/14/2019, 2013 SCION FR-S, NHTSA ID: 11234608)

HAD THE VALVE SPRING RECALL DONE ON MY VEHICLE. AFTER MY VHEICLE WAS FIXED CAR WAS MAKING TICKING NOISE. BRANG THE CAR BACK TO DEALERSHIP TO CHICK ON TICKING NOISE AND SAID THAT THE CAR WAS FINE, BRANG VEHICLE IN A FEW TIMES AND ALWAYS GET THE SAME ANSWER ON 7/19/18 WAS DRIVING ON THE HIGHWAY AND CAR WAS MAKING RAPID TICKING NOISE ENGINE STARTED LOSING POWER AND ENGINE DIED ON HIGHWAY. (7/19/2019, 2013 Subaru BRZ, NHTSA ID: 11233523)

TL* THE CONTACT OWNS A 2013 SUBARU BRZ. WHILE DRIVING APPROXIMATELY 65 MPH, A KNOCKING NOISE WAS HEARD FROM THE ENGINE COMPARTMENT AND THE VEHICLE SUDDENLY STALLED. THE VEHICLE WAS TOWED TO AN UNKNOWN DEALER, BUT WAS NOT DIAGNOSED OR REPAIRED. THE CONTACT STATED THAT THE VEHICLE WAS PREVIOUSLY SERVICED PER NHTSA CAMPAIGN NUMBER: 18V772000 (ENGINE). THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 120,000. (8/2/2019, 2013 Subaru BRZ, NHTSA ID: 11242089)

TL* THE CONTACT OWNS A 2013 SCION FR-S. WHILE DRIVING 20 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT WAS UNABLE TO RESTART THE VEHICLE. THE VEHICLE WAS TOWED TO AN INDEPENDENT MECHANIC AND THEN TO BALISE TOYOTA OF WARWICK (1400 POST RD, WARWICK, RI 02888, (401) 352-5911) WHERE IT WAS DIAGNOSED THAT THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE VEHICLE WAS RECENTLY REPAIRED PER NHTSA CAMPAIGN NUMBER: 18V772000 (ENGINE AND ENGINE COOLING). THE CONTACT WAS CONCERNED THAT THE FAILURE WAS DUE IN PART TO THE RECALL REPAIR. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 89,000. (9/20/2019, 2013 SCION FR-S, NHTSA ID: 11258511)

IN APRIL 2019, I BROUGHT MY 2013 SUBARU BRZ TO THE SUBARU DEALERSHIP FOR VALVE SPRING RECALL. ABOUT 5 MONTHS LATER WHILE I'M DRIVING HOME FROM WORK, MY CAR MAKING LOUD KNOCKING NOISE AND VIBRATE AGGRESSIVELY. I'M VERY FORTUNATE THAT I MAKE IT HOME SAFE. AFTER DOING SOME

RESEARCH, I FOUND OUT I'M NOT THE ONLY ONE HAD ENGINE FAILURE AFTER VALVE SPRING RECALL DONE. I TOW MY CAR TO THE DEALERSHIP AND THEY SAID IT WILL COST $1800 TO TEAR MY ENGINE APART AND CHECK FOR PROBLEM. I CALLED SUBARU CORPORATE AND THEY SAID THIS IS WORKMANSHIP ISSUE AND I NEED TO DEAL WITH THE DEALERSHIP. NOW I'M STUCK WITH A DEAD CAR. MY CAR WAS PERFECTLY FUNCTION BEFORE THE RECALL DONE. PLEASE INVESTIGATE THIS ISSUE. (10/4/2019, 2013 Subaru BRZ, NHTSA ID: 11267119)

TOOK OUR 2013 SCION FR-S TO TEMECULA VALLEY TOYOTA FOR J02 VALVE SPRING REPLACEMENT RECALL. AFTER ABOUT 6,000 MILES OF EASY DRIVING, FR-S BEGAN TO RUN ROUGH. THIS ROUGH RUNNING WAS ONLY INTERMITTENT AND EVENTUALLY SUBSIDED. ROUGH RUNNING ENGINE RETURNED ALONG WITH WHAT I CONSIDERED A "ROD KNOCK". WE IMMEDIATELY PARKED THE VEHICLE AND DID NOT USE IT AFTER FIRST NOTICING THE KNOCK. VEHICLE TOWED BACK TO DEALERSHIP WHO PERFORMED RECALL. DEALERSHIP INFORMS US THAT THE ENGINE IS "DESTROYED" (THEIR WORDS). DEALERSHIP CLAIMS ROD BEARING OR BEARINGS DAMAGED DUE TO "OIL STARVATION". DEALERSHIP QUOTES US $17,000 TO REPAIR VEHICLE, INCLUDING A REPLACEMENT SHORT BLOCK. WE REFUSE DEALERSHIP'S OFFER AND ASK THAT THEY LEAVE ENGINE OUT OF THE VEHICLE. DEALERSHIP PLACES ENGINE BACK INTO OUR VEHICLE AND SETS THE DRIVER'S SIDE HEADS IN THE TRUNK WITH OTHER VARIOUS PARTS PLACED ON THE BACK SEAT (NICE TOUCH). WE HAVE VEHICLE TOWED BACK TO OUR HOME. WE LOCATED A SUBARU MECHANIC IN OUR TOWN, REMOVE ENGINE FROM VEHICLE, TAKE ENGINE TO SAID MECHANIC WHO IS GOING TO INSPECT FOR DAMAGE, BALANCE, REBUILD, AND INSTALL THE ENGINE BACK INTO OUR VEHICLE. MECHANIC'S COST = $6,400. UPON OUR PARTIAL TEARDOWN OF ENGINE I FOUND, WHAT I CONSIDER, AN EXCESSIVE AMOUNT OF RUBBERY COMPOUND ON THE FRONT CASE OF THE ENGINE. I ALSO FOUND THIS SAME TYPE OF RUBBERY COMPOUND COVERING A SUBSTANTIAL PORTION OF THE OIL PICK UP TUBE SCREEN. I DO NOT KNOW THE CONDITION OF THE OILING PASSAGES WITHIN THE BLOCK. WE FOUND VERY LITTLE METALLIC MATERIAL IN THE OIL PAN. I AM SUSPICIOUS THAT THIS RUBBERY COMPOUND MADE ITS WAY INTO THE OIL AND CLOGGED OILING PASSAGES. DEALERSHIP IS DENYING ALL. MY COMPLAINT?: DEALERSHIP WAS OVER AGGRESSIVE IN THEIR USE OF SEALANT, CLOGGING OIL PASSAGES AND CAUSING OIL STARVATION TO THE BEARINGS. THEN, DENYING RESPONSIBILITY AND QUOTING A HIGH DOLLAR AMOUNT TO REPAIR. (11/23/2019, 2013 SCION FR-S, NHTSA ID: 11292466)

I TOOK IT IN FOR THE VALVE SPRING RECALL. I DROVE IT FOR 8000 MILES/9 MONTHS LATER. CAR STARTED KNOCKING AND STALLED. ENGINE HAD A OIL GALLEY THAT GOT CLOGGED, WHICH CAUSE OIL STARVATION. CAR ENDED UP NEEDING A NEW ENGINE, DEALERSHIP REFUSED TO COVER THE COST OF THE REPLACEMENT. THE CAR WAS BEING DRIVEN HOME ON A RESIDENTIAL STREET. *TR. (11/27/2019, 2013 SCION FR-S, NHTSA ID: 11324612)

VALVE SPRING RECALL PERFORMED ON THIS VEHICLE MAY 2019. CAR RAN GOOD FOR AROUND 5000 MILES BUT FEBRUARY 2020 I STARTED HEARING A SMALL KNOCK WHILE DRIVING AROUND 55 MPH. WITHIN 10 MILES THE KNOCK WAS VERY LOUD. CAR WAS TOWED TO DEALERSHIP WHO DIAGNOSED KNOCK AND A DESTROYED BEARING EITHER IN CRANK OR THE PISTON RODS. OIL PAN WAS DROPPED AND FOUND METAL SHAVINGS AND CHUNKS IN THE OIL PAN AS WELL AS SILICONE PIECES. SILICONE IS USED AS GASKET MATERIAL DURING THE RECALL PROCESS. I STILL HAD USED OIL FROM LAST FIRST OIL CHANGE AFTER THE RECALL AT HOME, AND FILTERED THAT OUT WITH A FINE MESH FILTER. SIGNIFICANTLY MORE SILICONE WAS FOUND IN THAT OIL. EVEN WITH ALL THE SILICONE IN THE OIL, THE DEALERSHIPS ARE CLAIMING ZERO FAULT OF THE ENGINE FAILURE. THIS SILICONE IS CAUSING HUNDREDS OF ENGINES TO FAIL, AND TOYOTA WILL ONLY TAKE RESPONSIBILITY IF THE CUSTOMER CALLS AND COMPLAINS FOR MONTHS. THE DENVER FIELD TECH SPECIALIST INSPECTED MY CAR AND SAID THE RECALL WAS DONE PROPERLY AND AGAIN THERE WAS NO FAULT OF TOYOTA. PEOPLE WITH FAILED ENGINES DUE TO THE RECALL DO NOT GIVE UP. MAKE TOYOTA TAKE RESPONSIBILITY. IF EVEN ONE PIECE OF THIS SILICONE MAKES IT PAST THE OIL SCREEN AND FILTER, IT HAS POTENTIAL TO CATASTROPHICALLY FAIL YOUR ENGINE AS IT DID WITH MINE. BEFORE YOU EVEN TAKE YOUR CAR TO A DEALERSHIP, BE SURE TO CALL TOYOTA CORPORATE AND OPEN UP A CASE. CORPORATE WILL LIKELY BE THE ONLY ONES WILLING TO WORK WITH YOU FOR ENGINE REPLACEMENT. (2/2/2020, 2013 SCION FR-S, NHTSA ID: 11320047)

VALVE SPRING RECALL (SUBARU RECALL WTY-84 AND NHTSA ID 18V-772) WAS PERFORMED AUG-SEP 2019. ON MARCH 16, 2020 WHILE DRIVING, THE CAR WAS EXPERIENCING ROD KNOCK AND HAD TO BE PULLED OFF THE ROAD AND TOWED TO FARRISH SUBARU IN FAIRFAX, VA. THE CAR'S ENGINE WAS TORN DOWN, SHORT BLOCK AND LONG BLOCK. FOUND A BEARING FAILURE DUE TO OIL STARVATION. IT IS NOW MAY 28, 2020, OVER 10 WEEKS SINCE THE CAR WAS TOWED TO THE DEALERSHIP AND I STILL DO NOT HAVE MY CAR BACK. I HAVE SR #[XXX] CASE NUMBER WITH SUBARU OF AMERICA WHO I CONTACTED TO GET INVOLVED. THERE ARE NUMEROUS

COMPLAINTS ON THE INTERNET ABOUT SUBARU BRZ, SCION FRS, TOYOTA 86S HAVING SERIOUS ENGINE PROBLEMS WITH A LOT HAVING SERIOUS ENGINE PROBLEMS AFTER THE RECALL NUMBERS STATED ABOVE. THIS IS A VERY SERIOUS AND DANGEROUS PROBLEM THAT NEEDS IMMEDIATE ATTENTION. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). *TR. (3/16/2020, 2013 Subaru BRZ, NHTSA ID: 11326285)

TL* THE CONTACT OWNS A 2013 SCION FR-S. THE CONTACT STATED THAT WHILE DRIVING AT 70 MPH, THE ENGINE BEGAN TO MAKE AN ABNORMAL TAPPING NOISE AS THE VEHICLE BEGAN TO STALL. THE CONTACT PULLED OVER BEFORE THE VEHICLE STALLED WITH THE CHECK ENGINE WARNING LIGHT ILLUMINATED. THE VEHICLE WAS TOWED TO JOHN ELWAY'S CROWN TOYOTA (1201 KETTERING DR, ONTARIO, CA 91761). THE CONTACT WAS INFORMED THAT ENGINE DEBRIS FROM THE CRANKSHAFT WAS FOUND IN THE OIL PAN. THE CONTACT STATED THAT MONTHS PRIOR TO FAILURE, HE TOOK HIS VEHICLE INTO THE SAME DEALER TO HAVE THE VEHICLE REPAIRED UNDER A MANUFACTURER'S RECALL FOR THE ENGINE SPRING VALVES. THE CONTACT WAS INFORMED BY THE DEALER THAT IF IT WAS DISCOVERED THAT THE FAILURE WAS LINKED TO THE RECALL, THE COST OF A NEW ENGINE WOULD BE COVERED HOWEVER, IF THE FAILURE WAS NOT RELATED TO THE RECALL, THE VEHICLE WOULD BE REPAIRED OUT OF POCKET. THE DIAGNOSTIC TEST SHOWED THAT THE FAILURE WAS NOT RELATED TO THE RECALL. THE MANUFACTURER HAD NOT BEEN NOTIFIED OF THE FAILURE. THE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 58,150.*DT*JB. (6/15/2020, 2013 SCION FR-S, NHTSA ID: 11329646)

I TOOK MY 2013 SUBARU BRZ TO THE SUBARU DEALERSHIP FOR THE WTY84 FA20 VALVE SPRING RECALL ON DECEMBER 24, 2019. THE DEALERSHIP KEPT MY CAR FOR THREE MONTHS AND I PICKED UP MY CAR ON MARCH 31, 2020 AFTER THE REPAIRS WERE COMPLETED. TWO AND A HALF MONTHS LATER, AND ONLY 1,600 MILES SINCE THE REPAIRS, ON JUNE 19, 2020 MY CAR STARTED LOSING POWER WHILE I WAS DRIVING ON THE FREEWAY AND STALLED. I PULLED TO THE SIDE OF THE ROAD AND WAS NOT ABLE TO RESTART THE CAR. STRANDED, I HAD NO CHOICE BUT TO CALL A TOW TRUCK TO TOW MY CAR TO THE DEALERSHIP. THE TOW TRUCK DRIVER CHECKED THE BATTERY, WHICH WAS IN GOOD HEALTH, AND TRIED TO JUMP-START THE ENGINE BUT THE ENGINE WOULD NOT TURN OVER. HE CHECKED THE OIL LEVEL AND IMMEDIATELY SAW METAL SHAVINGS IN THE OIL ADHERING TO THE DIPSTICK. HE LATER TRIED TO START THE CAR AGAIN AND THIS TIME THE CAR STARTED BUT THE ENGINE WAS MAKING A LOUD HORRIBLE KNOCKING NOISE. AT THE DEALERSHIP, I WAS TOLD THAT THE ENGINE HAD A ROD KNOCK, AND

POSSIBLE BROKEN ROD BEARING WITH SIGNS OF ENGINE FAILURE AND THAT I WOULD HAVE TO PAY $1,450 FOR A TEAR DOWN TO DETERMINE THE PROBLEM, AND ADDITIONAL FOR ANY REPAIRS. THERE HAVE NEVER BEEN ANY METAL SHAVINGS IN THE OIL PRIOR TO THE DEALERSHIP REPAIRS BEING DONE AND I HAVE NEVER HAD THESE PROBLEMS BEFORE. REGULAR OIL CHANGES HAVE BEEN COMPLETED EVERY 5,000 TO 7,500 MILES BY A LICENSED MECHANIC USING ONLY MOBIL 1 FULL SYNTHETIC MOTOR OIL AND OIL QUALITY AND LEVELS HAVE BEEN EXCELLENT BETWEEN CHANGES. THE CAR HAS 72,000 MILES AND HAS WORKED WONDERFULLY UP UNTIL NOW. (6/19/2020, 2013 Subaru BRZ, NHTSA ID: 11340290)

TOOK MY CAR TO THE JOHN ELWAY CROWN TOYOTA FOR THE J02 RECALL. THE DEALERSHIP HAD EXAMINE THE ENGINED AND STATED THAT IT WAS IN GOOD SHAPE AND ABLE TO GO AHEAD WITH THE RECALL. AFTER THE RECALL WAS DONE IT WENT GREAT; HOWEVER LESS THEN TWO MONTHS MY CAR STALLED IN THE MIDDLE OF THE STREET AT NIGHT TIME. I WAS ALMOST HIT BECAUSE OF THIS. I IMMEDIATELY TOOK IT TO THE DEALERSHIP AND THEY FOUND METAL SHAVINGS. THIS WAS INFORMED TO ME YESTERDAY. NOW, THE DIRECTOR JOSH DOES NOT TAKE ANY RESPONSIBILITY INTO THIS AND SAYS IT COULD HAVE BEEN "WEAR AND TEAR." PRIOR TO DOING MY RECALL MY ADVISOR ALEXIS GAVE ME A CALL TO LET ME KNOW MY ENGINE WAS IN GREAT CONDITION (JUST WANT TO MAKE THAT CLEAR.) METAL SHAVINGS SHOULD HAVE BEEN DETECTED WHEN DRAINING THE OIL FOR THE REPAIR, IF THE PROBLEM WAS THERE BEFORE THE RECALL LIKE THEY TRY TO EXPLAIN TO ME. THIS IS NOT THE FIRST CASE AND MANY MORE SCION FRS OWNERS FACE THIS EXACT SAME PROBLEM I AM FACING BECAUSE OF THE RECALL AND DEALERSHIPS DO NOT WANT TO OWN UP TO IT. (7/19/2020, 2013 SCION FR-S, NHTSA ID: 11341399)

ABOUT 6 MONTHS AFTER THE J02 RECALL WORK WAS DONE THE ENGINE DIED COMMUTING IN TRAFFIC WHILE ON THE HWY TRAVELING AT 65 MPH. TOWED TO DEALERSHIP WHERE THEY REPORT A SPUN BEARING DUE TO OIL STARVATION, YET THE CRANKCASE IS FULL WITH OIL (PER THEIR OWN INSPECTION) WITH ABOUT 25% LIFE BEFORE HAVING TO CHANGE OIL. I SUSPECT EXCESS RTV FROM THE RECALL WORK HAS CLOGGED THE PICKUP SCREEN OR AN OIL GALLEY. DEALERSHIP DENIES THAT EITHER OF THOSE 2 THINGS ARE THE CASE AND WON'T FIX VEHICLE, YET THEY CANNOT EXPLAIN THE "OIL STARVATION" IF THE CRANKCASE IS FULL OF OIL AND YOU QUOTE OIL STARVATION, THEN SOMETHING SOMEWHERE IS CLOGGED. YET THEY WONT ACCEPT RESPONSIBVLILITY DESPITE THIS BEING A KNOWN ISSUE AT TOYOTA. PLEASE HELP! (8/10/2020, 2013 SCION FR-S, NHTSA ID: 11374053)

BROUGHT MY CAR IN FOR THE J02 RECALL AS MANDATED BY CALIFORNIA DMV. I EXPRESSED CONCERNS OVER THE RECALL REPAIRS BEFORE WORK WAS DONE, DUE TO THE ALARMING NUMBER OF DEALERSHIP ISSUES AND THIS RECALL. THE SERVICE AGENT ASSURED ME THEY UNDERSTOOD THE COMPLEXITY OF THE REPAIR AND THAT THE TECHNICIANS WERE ADEQUATELY TRAINED. PICK UP MY CAR A WEEK LATER, AND HAVE ENGINE PROBLEMS WITHIN 30 MILES. BROUGHT IT BACK IN AND TOLD THEM WHAT THEY WOULD FIND IN THE OIL SUMP BEFORE THEY OPENED IT (METAL SHAVINGS AND SILICONE). I KNEW THIS BECAUSE OF ALL THE OTHER FRS OWNER ISSUES. SURE ENOUGH THEY FIND EXACTLY THAT IN THE OIL SUMP/PICKUP SCREEN. DEALER CLAIMED THAT WAS THEIR PREVIOUSLY AND NOT FROM THEIR WORK, BUT ASSURED ME THE ENGINE WAS RUNNING FIND WITH GOOD OIL PRESSURE. I EVEN ASKED WHAT WOULD HAPPEN IF I HAD THOSE PROBLEMS AGAIN, I WAS TOLD WE WILL CROSS THAT BRIDGE WHEN WE GET THERE. SO I DROVE IT TO WORK, AND HAD ENGINE FAILURE BEFORE I EVEN GOT INTO THE PARKING LOT. HAD TO PAY FOR A TOW TRUCK TO GET IT BACK TO THE DEALERSHIP. THEY CHARGED ME A 1200 DOLLAR DEPOSIT TO EVEN DIAGNOSE THE PROBLEM ONLY TO LATER TELL ME THAT CORPORATE TOYOTA NOR THE DEALERSHIP WILL BE TAKING ANY RESPONSIBILITY. I WAS TOLD I EITHER CAN TRADE IT IN (MINUS THE 3600 DOLLARS FOR ENGINE DISASSEMBLY WHICH I WAS FORCED INTO, DID NOT SIGN ANYTHING). I WANTED TO TAKE THE CAR BACK AND GET IT REPAIRED ELSE WARE BUT WAS TOLD I CANNOT HAVE THE VEHICLE BACK EITHER. I AM OUT THOUSANDS OF DOLLARS AND MY TRANSPORTATION TO AND FROM WORK WITH NOTHING I CAN DO ABOUT IT. (8/17/2020, 2013 SCION FR-S, NHTSA ID: 11351914)

MY TOYOTA SCION FR-S 2014 SUDDENLY STOPPED AND LOST ITS POWER WHILE I WAS DRIVING ALONG A CITY STREET IN FAIRFIELD CA . THE CAR HAS BEEN SERVICED BY THE DEALER SINCE PURCHASE . IT ONLY HAD 33,000 MILES AND I WAS VERY SURPRISE WHAT WENT WRONG . MY SON ROLLED THE VEHICLE TO A SIDE STREET . WE CALLED OUR INSURANCE FOR ROADSIDE ASSISTANCE AND THE CAR WAS TOWED TO TOYOTA DEALERSHIP IN FAIRFIELD CA. THEY WENT ON TO DIAGNOSE AND FOUND THE CAR TO BE OF PEARL CONDITION , WITH PERFECT OIL LEVEL AND QUALITY . THEY SAID IT WAS MOTOR MALFUNCTION . THE VALVE SPRINGS WERE OUT OF PLACE AND CREATED A STRANGE NOISE . THEY RECOMMENDED MOTOR REPLACEMENT WHICH WOULD COST ME $11K FOR A USED ENGINE WITH 51K MILES . I WAS TOLD THAT THIS IS VERY COMMON INCIDENT WITH TOYOTA FRS 2012 TO 2014 MODELS . THERE WAS A RECALL BUT IT WAS HALTED BECAUSE AFTER THE RECALL , MOST

RECALLED TOYOTA FRS STILL GET STALLED DUE TO THE SEALANTS USED . WE HAVE SEVERAL (ALL TOYOTA ) CARS AND THIS CAR IN PARTICULAR IS JUST USED 40 MILES A MONTH . OUR RESTAURANT IS JUST A MILE AWAY FROM WHERE WE LIVE . THAT IS WHY THERE IS NO WAY WE HAD NOT TAKEN CARE OF THIS CAR . I CHECKED THE RECALLS FOR THIS MODEL AND MAKE , AND THERE IS NONE ! IT HAPPENED WHEN WE WERE DRIVING AT A SPEED OF 15 ON A CITY SIDE STREET , JUST HEADING STRAIGHT AHEAD. (4/17/2021, 2014 SCION FR-S, NHTSA ID: 11413745)

AFTER COMPLETING THE VALVE SPRING RECALL I GOT MY CAR BACK AND NOT 200 MILES LATER THE ENGINE STARTED TO HAVE ROD KNOCK. THE TOYOTA DEALERSHIP TOLD ME THAT THERE WAS NOW METAL IN MY OIL PAN AND I WOULD NEED A NEW ENGINE. THIS IS NOT A UNIQUE ISSUE, IT HAS BEEN HAPPENING TO HUNDREDS OF OTHER CARS GOING THROUGH THIS EXACT RECALL, FOR YEARS NOW. (2/2/2022, 2013 SCION FR-S, NHTSA ID: 11450284)
THE ENGINE SUFFERED CATASTROPHIC FAILURE 2,988 MILES AFTER THE J02 SAFTEY RECALL WAS PERFORMED BY PRESTON TOYOTA OF NEW CASTLE, PA. I WAS TRAVELLING AT HIGHWAY SPEEDS WHEN THE ENGINE DIED AND WOULD NOT TURN ON. I LOST ALL POWER BRAKES AND COULD HAVE WRECKED AND INJURED MYSELF, OTHERS OR WORSE, CAUSED A FATALITY. THE CAR WAS TOWED TO A TOYOTA DEALERSHIP THAT CONFIRMED THE ISSUE WAS DUE TO THE WORK PERFORMED DURING THE RECALL ON THE CAR. THE OIL LIGHT FLASHED A FEW TIMES THEN SHUT OFF AND THEN A FEW SECONDS LATER THE ENGINE DIED. (8/2/2022, 2022 TOYOTA GR86, NHTSA ID: 11477681)

UNKNOWN/ SEEMS TO BE TO MUCH RTV USED ON THE OIL PAN WHEN THE CAR WAS BEING BUILT THERE ARE MULTIPLE REPORTED CASES OF THIS AND THE EXCESS RTV IS COMING LOOSE AND FALLING IN THE OIL PAN WHICH THEN IS BEING SUCKED UP THROUGH THE PICK UP TUBE AND CAUSING OIL STARVATION. (8/2/2022, 2022 TOYOTA GR86, NHTSA ID: 11477891)

THERE ARE EXCESS RTV SILICONE THAT CAN BE SEEN FROM ENGINE OIL DIP STICK. SIGN OF HAVING EXCESS RTV THAT CAN CAUSE DAMAGE TO THE ENGINER. SAME ISSUE HAPPENED TO ONE OF THE GR86 ENTHUSIAST GROUP MEMBER HAVING EXCESS RTV GOT MIXED WITH THE ENGINE OIL AND IT GOT STUCK THROUGH THE OIL PICK UP STRAINER THAT CAUSE TO CLOGGED AND OIL STARVATION AND DAMAGE TO THE ENGINE. (8/5/2022, 2022 TOYOTA GR86, NHTSA ID: 11477813)

DUE TO RECENT EVENTS AND ISSUES , I HAVE FOUND EXCESS SILICONE STUCK IN MY OIL PAN FILLER TUBE . I HAVE ALSO FOUND RESIDUE OF SILICONE IN MY ENGINE DIPSTICK. I AM AFRAID THIS WILL CAUSE OIL STARVATION AS IT HAS HAPPENED TO OWNERS ALREADY. I AM AFRAID FOR THE SAFETY OF ME AND MY PASSENGERS IN THE VEHICLE. (8/6/2022, 2022 TOYOTA GR86, NHTSA ID: 11477914)

THERE SEEMS TO BE SILICONE EXCESS IN THE OIL , SEEN OTHER VEHICLES RESULT IN ENGINE PROBLEMS DUE TO OIL STARVATION. (8/7/2022, 2022 TOYOTA GR86, NHTSA ID: 11478021)

ENGINE KNOCKING DUE TO OIL DEPRIVATION. HAVE HEARD AND READ ARTICLES OF RTV BEING THE CULPRIT AS IT CLOGS THE OIL PICK UP. ALTHOUGH THE DEALERSHIP HASN'T EXACTLY TOLD ME WHAT CAUSED OIL DEPRIVATION ON MY CAR. (8/31/2022, 2022 TOYOTA GR86, NHTSA ID: 11486755)

THESE GR86'S ARE SO COMMONLY KNOWN FOR HAVING EXCESSIVE RTV SEALANT IN THE ENGINE WITH THE OIL INTAKE TUBES BECOMING BLOCKED UP. I CONTACTED TOYOTA ABOUT A SOLUTION, BUT THERE'S NOTHING. NO RECALL. EVERYTHING IS CASE BY CASE. AND IF YOU TRACK YOUR CAR WITH THE INCLUDED TRACK DAY WHEN YOU BUY THE CAR THE WARRANTY CAN BECOME NULL AND VOID. (9/30/2022, 2022 TOYOTA GR86, NHTSA ID: 11487353)

AS OWNER OF 2022 GR86, I READ ABOUT RTV ISSUE WHERE THE MANUFACTURER PUT TOO MUCH RTV ON OIL PAN. IT WOULD STICK OUT EXCESSIVELY INSIDE THE OIL PAN AND IT WOULD BREAK OFF TO BLOCK ENGINE OIL TUBE FILTER. IT WOULD CAUSE ENGINE TO RUN DRY ONCE BLOCKED AND CAUSE ENGINE FAILURE. I WENT TO DEALER FOR OIL CHANGE AND THEY SHOWED ME PICTURES OF OTHER GR86 THAT DROPPED THE PAN AND IT WAS CLOGGED COMPLETELY. SO IN ORDER TO PREVENT ENGINE FAILURE, I ASKED THEM TO DROP MY PAN AS WELL AND THEY SENT ME PICTURES OF RTV ON THE OIL PICKUP TUBE AS WELL AS THE EXCESS RTV INSIDE THE OIL PAN THAT WOULD POTENTIALLY CLOG THE TUBE IN THE FUTURE. (10/20/2022, 2022 TOYOTA GR86)

ENGINE FAILURE DUE TO THE MANUFACTURE APPLYING TOO MUCH SILICONE THAT RESTRICTED OIL FLOW. (11/25/2022, 2022 TOYOTA GR86, NHTSA ID: 11495011)

106.     The above complaints are just a sampling of those submitted to NHTSA. While the

existence of any reports to NHTSA about Defendants' Engine Defect is significant, the number of

NHTSA complaints must be understood as a mere fraction of the reports and complaints related to the Engine Defect Defendants received and were otherwise aware of starting soon after the first Class Vehicles were sold. This is so because NHTSA complaints are only a fraction of the number of complaints actually made by consumers, who are more inclined to go to websites hosting vehicle owner forums, or directly to Defendants' dealerships or to Defendants themselves when components fail.

### 3.    On-line Consumer Complaints

107.    Defendants also knew or should have known about the Engine Defect and its associated risks through the numerous consumer complaints submitted on Toyota and/or Subaru owner forums.[9]

108.    Online reputation management (commonly called "ORM" for short) is now a standard business practice among most major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products. "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation."[10] The growth of the internet and social media and the advent of reputation management companies have led to ORM becoming an integral part of many companies', including Defendants', marketing efforts.

---

[9] *See* https://www.gr86.org/threads/rtv-sealant-2023-models.3389/

[10] Moryt Milo, *Great Businesses Lean Forward, Respond Fast*, SILICON VALLEY BUSINESS JOURNAL (September 5, 2013), http://www.bizjournals.com/sanjose/print-edition/2013/05/17/great-businesses-lean-forward-respond.html

109.    For example, in  May 2014, one Class member made the following post regarding a 2013 FR-S that suffered catastrophic engine failure at 38,00 miles.[11]



110.    As a further example, below is a 2021 forum post regarding a 2014 BRZ. [12]



### 4.    Warranty Data

111.    Defendants also knew about the Engine Defect from its warranty data. Per the TREAD Act, Defendants tracks vehicle diagnoses and repairs from dealership technicians in a

---

[11] https://www.ft86club.com/forums/showthread.php?t=65509

[12] https://www.subarubrzforum.com/threads/2014-engine-destroyed.194999/?post_id=361709&nested_view=1&sortby=oldest#post-361709

single, aggregated database. Defendants employ people who monitor the database for repair trends, and engineering and management staff review such trends in regular meetings. For every one complaint filed with NHTSA, Defendants likely receive hundreds or thousands of related warranty claims. Accordingly, Defendants have likely received hundreds or thousands of the Engine Defect warranty claims. In fact, Defendants have issued recalls for issues with less field complaints.[13]

112.    Despite Defendants' knowledge of the serious safety risks the Engine Defect causes in the Class Vehicles, it has not disclosed the Defect or provided an adequate repair to all Class Vehicles.

**E.    Defendants Touted the Class Vehicles as Safe and Reliable Vehicles While Omitting the Engine Defect.**

113.    Notwithstanding Defendants' exclusive and superior knowledge of the Engine Defect, Defendants knowingly marketed and sold/leased the Class Vehicles with the Engine Defect while willfully omitting and concealing the true inferior quality and substandard performance of the Class Vehicles.

114.    Defendants directly market, for their benefit, the Class Vehicles to consumers via extensive nationwide multimedia advertising campaigns on television, the internet, billboards, print, mailings, social media, and other mass media, which impart a universal and pervasive marketing message: safe and reliable vehicles.  Defendants' marketing statements are thus mere partial disclosures that do not include any information about the Engine Defect.

115.    Although Defendants market the Class Vehicles as durable, reliable, and capable vehicles, in the field, the Class Vehicles fail to meet that promise. Instead, Defendants omit the

---

[13] 19V-744 (Subaru, 12 field reports); 23V-720 (Toyota, 13 field reports).

true nature of the Class Vehicles and the fact that the Class Vehicles suffer from the Engine Defect. Defendants have never disclosed the Defect to Plaintiff or the other Class members.

116.    Because Defendants had exclusive knowledge of the Engine Defect, and were thus in a superior position as to Plaintiff, Plaintiff necessarily reposed her trust and confidence in Defendants to provide full disclosures (not merely partial disclosures) of material aspects of the Class Vehicles, like the engine and the Engine Defect. The fact of the Engine Defect was basic to the transaction and Plaintiff and Class members purchased their Class Vehicles in the mistaken belief that the engine was not defective.

117.    Plaintiff and the other Class members were exposed to Defendants' pervasive and long-term marketing campaign touting the supposed quality, reliability, and capability of the Class Vehicles.

118.    For example, the image below is from the brochure for the 2019 Toyota 86 in which Toyota touts the engines horsepower.[14]

---

[14] 2019 Toyota 86 Brochure
https://www.toyotacertified.com/content/dam/tcuv/sections/brochures/en/toyota-86/2019_86_ebrochure.pdf

PERFORMANCE/DRIVING EXPERIENCE

# The hustle behind the moves.

86 is more powerful than ever, with its high-tech Boxer engine delivering up to an impressive 205 horsepower[22] and 156 lb.-ft. of torque in manual transmission versions. And with a 7200 rpm redline, the thrills build with the revs. A close-ratio 6-speed transmission comes standard, giving you quickness off the line and the power you want in the corners. For the driving purist, the standard manual transmission gives short, precise throws for a driving experience like no other. And for those who prefer two pedals, the available 6-speed Electronically Controlled automatic Transmission with intelligence (ECT-i) features race car-inspired paddle shifters mounted on the steering wheel. So no matter your preferred driving style, you're always in control.

  

**BOXER-FOUR ENGINE**

Powering 86 is a potent 2.0-liter flat-four engine. With compact packaging, this engine sits low in the chassis for optimal balance. It's got some muscle, too, with manual-transmission cars featuring an optimized power curve, 205 horsepower[27] and 156 lb.-ft. of torque. In the automatic-equipped 86, this engine pumps out 200 horsepower and 151 lb.-ft. of torque.

**VSC™ FULL-OFF MODE**

Designed for track days, 86's unique Vehicle Stability Control (VSC) sport tuning allows the driver to shut off all stability assists. When on a racetrack, this Full-Off Mode prevents the VSC from kicking in, putting the driver in full control.

**HILL START ASSIST CONTROL[17]**

Every 86 comes standard with Hill Start Assist Control (HAC). This convenient technology helps to keep the vehicle from rolling backward when switching from brake to accelerator on an incline.

See numbered footnotes in Disclosures section.

119.    Additionally, the image below is also from the brochure for the 2019 Toyota 86 in which Toyota markets the vehicle as "just as comfortable cruising down the freeway as it is at devouring apexes" and "is engineered to deliver".[15]

---

[15] 2019 Toyota 86 Brochure
https://www.toyotacertified.com/content/dam/tcuv/sections/brochures/en/toyota-86/2019_86_ebrochure.pdf



120.    Toyota made the same or similar statements and omissions in all marketing materials for all Class Vehicles.

121.    Subaru made similar statements and omissions in its marketing materials. For example, in the sales brochure for the 2019 Subaru BRZ:



122.    Subaru made the same or similar statements and omissions in all marketing materials for all Class Vehicles.

123.    Plaintiff and the other Class members, as any reasonable consumer would, justifiably made their decisions to purchase or lease their Class Vehicles based, in material part, on Defendants' misleading partial disclosures in marketing, including affirmations of fact, promises, and representation, which also omitted any disclosure of the Engine Damage Defect.

124.    Defendants have actively concealed the Engine Defect throughout the Class period despite its pervasive knowledge. Specifically, Defendants have:

a.    Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Engine Defect;

b.    Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles suffered the Engine Defect, were defective, and not fit for their intended purposes;

c.    Failed to disclose, and actively concealed, the fact that the Class Vehicles suffered the Engine Defect and were defective, despite that Defendants learned of the Defect as early as 2018 or before, and certainly well before Plaintiff and the other Class members purchased or leased their Class Vehicles; and

d.    Failed to disclose, and actively concealed, the existence and pervasiveness of the Defect even when Class members directly asked about it during communications with Defendants, Defendant dealerships, and Defendant service centers.

125.    Defendants also create or approve much, if not all, of the marketing materials provided by a Toyota- or Subaru-authorized dealership to consumers prior to or at the time of purchase. Defendants, through their dealers and those marketing materials, could have disclosed the Defect and the true nature of the Class Vehicles, but it failed to do so. As a result of Defendants'

omissions of material facts at the point of sale, Plaintiff and Class members have overpaid for their vehicles.

**F.    Defendants' Dealerships Are Defendants' Agents and Plaintiff and Class Members Are Intended Third Party Beneficiaries of the Dealership Agreements Between Defendants and Their Dealers and of the Warranties Provided by Defendants**

126.    SOA and TMNA are not innocent third parties in Plaintiff's and Class members' purchase transactions for the Class Vehicles.  TMNA, along with TMC, jointly drafted, approved, and affixed the Monroney labels to the Class Vehicles and selected what partial information about the Class Vehicles' engines to disburse in to the stream of commerce to Plaintiff and Class members, which omitted any information about the Engine Defect. Likewise, SOA, along with Subaru Corp., jointly drafted, approved, and affixed the Monroney labels to the Class Vehicles and selected what partial information about the Class Vehicles' engines to disburse in to the stream of commerce to Plaintiff and Class members, which omitted any information about the Engine Defect.  Defendants, including TMNA and SOA, could have disclosed material information about the Engine Defect directly to Plaintiff through the many channels of communication open between Defendants and Plaintiff, but they chose to profit from silence.

127.    Defendants control their dealerships, and the dealerships act for the benefit of the Defendants.

128.    Namely, pursuant to their dealership agreements and standard provisions, Defendants control, among other things, what vehicles the dealerships sell; the number of vehicles supplied to dealerships (based on sales performance); how dealerships market the vehicles; what incentives and rebates a dealership can offer; the layout of dealerships, including logo placements; and how to diagnose and repair issues. Moreover, when dealerships sell the vehicles to consumers, they bind the Defendants to a contract (e.g., warranties).

129.     Authorized dealers are Defendants' agents, such that an opportunity to receive information from an authorized dealership is an opportunity to receive information directly from Defendants.   This agency relationship is established by the fact that, among other things: Defendants' logo is displayed at authorized dealerships; Defendants issue technical bulletins and service instructions to dealerships detailing potential vehicle problems, and also relies on them to repair vehicles and to perform recalls; Defendants distribute various advertising and promotional material to its dealerships, including brochures, booklets, and pamphlets; and under the terms of its express warranty, Defendants require their customers to return to their authorized dealerships to perform warranty repairs. Furthermore, Defendants' relationship with their dealerships is governed by a dealership agreement and standard provisions that impose a number of reciprocal obligations on both the Defendants and the dealerships.

130.     The market for new cars, which involves a manufacturer and distributor with an extensive established network of authorized dealers that sell its cars, is structured such that drivers must buy from an authorized dealer and do not have the option to buy directly from SOA or TMNA or the other Defendants. The dealers are not intended to be the ultimate consumers of the Class Vehicles.  The dealership contracts ("contracts") entered into between Defendants and dealers of the Class Vehicles, and the warranties, show that Plaintiffs and Class Members are intended beneficiaries of the contracts and of the warranties provided by Defendants.

131.     Under a heading titled "Customer Satisfaction," for example, the Subaru Standard Provisions (which are part of the dealership contracts between the Subaru Defendants and Subaru dealers) state:

> Distributor and Dealer acknowledge the importance of satisfying their customers and the necessity of promoting the image and reputation of Subaru Products in the marketplace. Distributor and Dealer further acknowledge that in the marketing,

sales, and servicing of Subaru Products, it shall be the goal of Distributor and Dealer to achieve the highest level of customer satisfaction possible.

132.    Under a heading titled "Customer Satisfaction Responsibilities of Dealer, the Subaru Standard Provisions further state:

Dealer acknowledges that Dealer is the primary contact with the customer, and, therefore, Dealer shall have the principal responsibility of advancing the goals of customer satisfaction. Accordingly, Dealer agrees to keep Distributor informed about customer complaints and concerns. Furthermore, Dealer agrees to use its best efforts to resolve customer satisfaction issues in a fair and honest manner, keeping as the primary objective the courteous and expeditious treatment of the customer.

133.    Under a heading titled "Service of Subaru Products," the Subaru Standard Provisions also state:

Dealer acknowledges the importance of proper and professional servicing of Subaru Products and the fair dealing with the consuming public in servicing of Subaru Products. Therefore, Dealer shall provide the best possible customer service to all Vehicle owners who may request such service. Dealer agrees that all service appointments shall be scheduled, and prompt and efficient service shall be provided, for all Vehicles, whether or not under warranty and without regard to where the Vehicle was originally purchased. Furthermore, Dealer agrees to honor all authorized Subaru extended service contracts . . . . Dealer shall fully cooperate with Subaru Customer/Dealer Services and shall investigate and handle all complaints received from Vehicle owners with a view to securing and maintaining a high level of customer satisfaction and the goodwill of Vehicle owners toward [Subaru Corp.], SOA, Distributor, Dealer, and all other Subaru dealers.

134.    The Toyota Dealership Agreement provides in pertinent part:   "It is of vital importance to DISTRIBUTOR that Toyota Products arc sold and serviced *in a manner which promotes consumer confidence and satisfaction and leads to increased product acceptance*." (Emphasis added).

135.    The Toyota Standard Provisions, which are part of the dealership contract between the Toyota Defendants and Toyota dealers, are to similar effect.  Under a heading titled  "Dealer Service Obligations," the first subsection, titled "Customer Service Standards," provides:

DEALER and DISTRIBUTOR agree that the success and future growth of
DISTRIBUTOR and DEALER are substantially dependent upon the customer's
ability to obtain high-qualify vehicle servicing. Therefore, DEALER agrees to:

1.    Take all reasonable steps to provide service of the highest quality for all
Toyota Motor Vehicles, regardless of where purchased and whether or not under
warranty.
            . . . . .

4. Ensure that the customer is treated courteously and fairly at all times.

123.    Under    a    heading    titled    "CUSTOMER    SATISFACTION

RESPONSIBLITIES," the Toyota Standard Provisions further provide:

A goal of DISTRIBUTOR and DEALER is to be recognized as marketing the finest
products and providing the best service in the automobile industry. The Toyota
name should be synonymous with the highest level of customer satisfaction.
DEALER will take all reasonable steps to ensure that each customer is completely
satisfied with his or her Toyota Products and the services and practices of
DEALER.

Whenever requested by DISTRIBUTOR, DEALER shall:

A. Designate an employee responsible for customer satisfaction commensurate
    with the needs of the marketplace; and

B. Provide a detailed written plan of DEALER'S customer satisfaction program to
    DISTRIBUTOR and implement such program on a continuous basis. This plan
    shall include an ongoing system for:

    1.  Emphasizing customer satisfaction to all DEALER'S employees;

    2.  Training DEALER'S employees, including participation in
        DISTRIBUTOR'S customer satisfaction training at DEALER'S
        expense; and

    3.  Responding immediately to, and resolving promptly, requests for
        customer assistance, and conveying to customers that DEALER is
        committed to the highest possible level of customer satisfaction.

124.    Finally, the Toyota Standard Provisions provide that the "DISTRIBUTOR will

evaluate DEALER'S performance of its responsibilities in the area of customer satisfaction based

on" various considerations.  These include (1) "customer satisfaction reports . . .  as will permit DEALER to assess its performance and maintain the highest level of customer satisfaction," and (2) an agreement by "Dealer . . . to develop, implement and review with DISTRIBUTOR specific action plans for improving results in the event that DEALER is below the average customer satisfaction levels for other Toyota dealers in such areas that DISTRIBUTOR believes are a reasonable basis for comparison."

125.    Upon information and belief, Defendants work with the Subaru and Toyota dealerships in the United States on issues related to sales, marketing, technical training, and the service of parts and accessories.

126.    Upon information and belief, the Subaru and Toyota dealers have executed dealer agreements with SOA and TMNA. Upon information and belief, these dealer agreements set forth franchise standards established by Defendants that dealers must comply with.

127.    Upon information and belief, Defendants regularly, continuously, and systematically provide support to and control over the dealerships. Upon information and belief, Defendants' employees regularly and systematically work at the dealerships to educate dealership employees regarding features of Defendants' vehicles, including but not limited to features regarding the engines.

136.    Upon information and belief, through their exclusive agents, instrumentalities and representatives, SOA and TMNA provide new car warranty service on Class Vehicles. Upon information and belief, SOA and TMNA warrant to the original and each subsequent owner of a Class Vehicle that any authorized dealer will make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period.  Upon information and belief, all such warranty work is paid for by SOA and TMNA.

137.     Upon information and belief, SOA and TMNA provide a warranty and maintenance guide or booklet to their customers, including those customers that purchased or leased Class Vehicles. The guide or booklet recommends that Defendants' consumers seek any repairs or service in the first instance from Defendants' dealers for warranty service, maintenance, guidance and questions regarding the vehicle and any warranty or service issues.

### G.     Defendants' Warranties.

138.     As to the warranties provided with the Class Vehicles, the Dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under those warranties; the warranties were designed by Defendants for and intended to benefit purchasers and lessors of the Class Vehicles only, not the dealers who were to act on the behalf of Defendants in providing service to the purchasers and lessors under the warranties.

139.     Under a heading titled "Product Warranty," the Subaru Standard Provisions state in relevant part:

> Dealer shall make all sales of Subaru Products which may be covered by a Warranty in such manner that the customer shall acquire all rights in and be subject to all limitations and disclaimers in accordance with the Warranty, to the exclusion of any other warranties, whether express or implied, and whether for merchantability or fitness for any particular purpose, to the extent permitted by applicable law.

140.     The warranty procedures outlined in the Subaru Standard Provisions further provide "that  the customer shall not be obligated to pay any charges for Warranty work, for any reason whatsoever."

141.     The warranty procedures outlined in the Toyota Standard Provisions similarly state that "Warranty service provided for the benefit of customers and DEALER agrees that the customer shall not be obligated to pay any charges for warranty work or any other services for which DEALER is reimbursed or paid by DISTRIBUTOR.

142.    Upon information and belief, the dealerships located within the United States are SOA's and TMNA's exclusive agents, instrumentalities, and representatives for the provision of all new warranty service for Subaru and Toyota vehicles sold both within the United States. Upon information and belief, if a customer of Defendants' needs to have new car warranty repairs performed, Defendants requires the Subaru or Toyota customer to have the work performed at the authorized dealer.

143.    244. Plaintiffs and members of the Nationwide Class have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and members of the Nationwide Class, on the other hand. For example, the Plaintiffs and Class Members received warranties provided by Defendants upon the purchase of their vehicles. The warranties were prepared and disseminated by Defendants

144.    Defendants issued a Powertrain Warranty for the Class Vehicles. Defendants issued Powertrain Warranties for the benefit of Plaintiff and the other Class members, and for the purpose of persuading Plaintiff and the other Class members to purchase the Class Vehicles.

145.    Toyota's Powertrain Warranty states, in part:

This warranty covers repairs needed to correct defects in materials or workmanship of any component listed below and in the next column and supplied by Toyota, subject to the exceptions indicated under "What Is Not Covered" on pages 14–15. Coverage is for 60 months or 60,000 miles, whichever occurs first.

**Engine:** Cylinder block and head and all internal parts, timing gears and gaskets, timing chain/belt and cover, flywheel, valve covers, oil pan, oil pump, engine mounts, turbocharger housing and all internal parts, supercharger housing and all internal parts, engine control computer, water pump, fuel pump, seals and gaskets.[16]

146.    Subaru's Powertrain Warranty state, in part:

---

[16]https://assets.sia.toyota.com/publications/en/omms-s/T-MMS-1986/pdf/T-MMS-1986.pdf?_gl=1*1fvwhw1*_tmna_ga*Njk4MTY5NTcyLjE2OTk1ODc1MODg.*_tmna_ga_EP43E5EFVZ*MTY5OTQ3MzU4Ny4xLjEuMTY5OTQ3MzY4OS40NC4wLjA.

POWERTRAIN COVERAGE for all models is 5 years or 60,000 miles, whichever comes first. Subject to the exclusions listed in this warranty, it covers the major powertrain components listed below.

**Powertrain Coverage Components:** Engine, Engine block and all internal parts, Cylinder heads and valve trains, Oil pump, oil pan, Timing belts or gears and covers, Water pump, Flywheel, Intake and exhaust manifolds, Oil seals and gaskets.[17]

147.    Defendants instruct vehicle owners and lessees to take their vehicles to a certified dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to Toyota or Subaru-certified dealerships with complaints arising from the Engine Defect and have been denied free repair.

148.    Defendants have evaded its warranty obligations by (1) failing to tell consumers that the Class Vehicles are defective and (2) refusing to perform repairs and/or failing to issue adequate repairs to correct the Engine Defect timely.

149.    Plaintiff provided pre-suit notice, as alleged above. Defendants also have notice of their breach based on their actual and exclusive knowledge of the defect, as well as through the complaints submitted to them or dealerships via warranty claims or call centers.

150.    Moreover, notice is not required because Defendants' warranties fail in their essential purpose because the companies have failed to offer an effective and permanent repair for the Engine Damage Defect.

151.    Moreover, Defendants' failure to effectively repair the Engine Defect makes any notice requirement futile.

---

[17] https://www.subaru.com/content/subaru/en/owners/vehicle-resources/warranties-2019.html

## VI.    TOLLING OF THE APPLICABLE STATUES OF LIMITATION

### A.    Discovery Rule Tolling

152.    Plaintiff and the other Class members had no way of knowing about Defendants' deception with respect to the Engine Defect in the Class Vehicles.

153.    Within the time period of any applicable statutes of limitation, Plaintiff and the other Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Engine Defect in the Class Vehicles and misrepresenting the safety, quality, and reliability of the Class Vehicles.

154.    Plaintiff and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants did not report information within their knowledge to federal and state authorities, the dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Defendants had concealed information about the true nature of the Engine Defect in the Class Vehicles, which was discovered by Plaintiff only shortly before this action was filed. Nor, in any event, would such an investigation on the part of Plaintiff and other Class members have disclosed that Defendants valued profits over the safety of its customers, their friends and family, and innocent bystanders.

155.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims asserted herein.

### B.    Fraudulent Concealment Tolling

156.    Throughout the time period relevant to this action, Defendants concealed from and failed to disclose to Plaintiff and the other Class members vital information about the Engine Defect described herein.

157.    Indeed, Defendants kept Plaintiff and the other Class members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiff nor the other Class members could have discovered the defect, even upon reasonable exercise of diligence.

158.    Defendants were aware that the Engines that it installed in the Class Vehicles were defective before the first Affected Vehicle was sold or leased.

159.    Despite their knowledge of the defect, Defendants failed to disclose and concealed, and continues to conceal, this critical information from Plaintiff and the other Class members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

160.    Defendants affirmatively and actively concealed the Engine Defect when it continued marketing the Class Vehicles and introducing new vehicles with the defective Engines, despite knowing that the Engines are defective.

161.    Plaintiff and the other Class members justifiably relied on Defendants to disclose the Engine Defect in the Class Vehicles that they purchased or leased, because that defect was hidden and not discoverable through reasonable efforts by Plaintiff and the other Class members.

162.    Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims for damages that Plaintiff and the other Class members have sustained as a result of the Defect, by virtue of the fraudulent concealment doctrine.

**C.    Estoppel**

163.    Defendants knew about the Engine Defect prior to the first Affected Vehicle being sold or leased.

164.    However, Defendants did not disclose the Engine Defect to Plaintiff or the other Class members, nor did Defendants warn Plaintiff and Class members of the dangers of the Engine Defect.

165.    Instead, Defendants continued to mass-market the Class Vehicles, including the Engines, solely for the purpose of generating revenues for Defendants' benefit.

166.    Defendants were under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the Engines in the Class Vehicles.

167.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the Engines in the Class Vehicles.

168.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ACTION ALLEGATIONS

169.    Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), on behalf of the following classes:

### The Nationwide Class

All persons or entities who purchased or leased one or more of the Class Vehicles.

### The Arkansas Class

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Arkansas.

170.    Excluded from the Classes are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Class definition.

171.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

172.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

173.  **Numerosity (Federal Rule of Civil Procedure 23(a)(1))** – There are tens of thousands of Class Vehicles. The members of the Class are so numerous that their individual joinder is impracticable. The number and identity of Class members can be obtained through business records regularly maintained by Defendants, its employees and agents, and state agencies. Members of the Class can be notified of the pending action by e-mail and mail, supplemented by published notice, if necessary.

174.  **Commonality and Predominance (Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3))** – There are questions of law and fact common to the Class. These questions predominate over any questions only affecting individual Class members. The common legal and factual issues include, but are not limited to:

a.  whether Defendants engaged in the conduct alleged herein;

b.  whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.  whether Defendants designed, manufactured, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States knowing about the Engine Defect;

d.  when Defendants learned of the Defect;

e.  whether Defendants concealed the Defect from consumers;

f.  whether Defendants failed to disclose or omitted the Defect;

g.  whether the Defect is material;

h.  whether the Class Vehicles are merchantable;

i.  whether Defendants honored their warranties;

j.      whether Plaintiff and other Class members have been harmed by the fraud alleged herein;

k.      whether Plaintiff and the other Class members overpaid for their Class Vehicles;

l.      whether Plaintiff and the other Class members are entitled to damages or other relief; and

m.     whether Plaintiff and the other Class members are entitled to equitable relief in the form of rescission of the purchase agreement or other injunctive relief and, if so, in what amount.

175.    **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiff's claims are typical of the claims of each of the other Class member of. Plaintiff, like all other Class members, has sustained damages arising from Defendants' conduct as alleged herein. Plaintiff and the other Class members were and are similarly or identically harmed by Defendants' unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct.

176.    **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiff will fairly and adequately represent and protect the interests of the other Class members and has retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation. There are no material conflicts between Plaintiff's claims and those of the other Class members that would make class certification inappropriate. Counsel for the Class will vigorously assert all Class members' claims.

177.    **Superiority (Federal Rule of Civil Procedure 23(b)(3))** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), because questions of law and fact common to the Class predominate over the questions affecting only individual Class

members and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual Class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct. Further, it would be virtually impossible for Class members to individually redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

178. **Issues Class:** Alternatively, Plaintiff seeks certification pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the above-defined classes for some or all the issues identified in the commonality and predominance section, above, as well as other issues which may be later identified.

179. **Injunctive Relief**: Plaintiff seeks certification pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of the above-defined classes for injunctive relief as outlined herein.

**A.**     **Claims Brought on Behalf of the Nationwide Class**

**COUNT I**
**Violations of 15 U.S.C. § 2301, *et seq.***
**The Magnuson-Moss Warranty Act**
**(Individually and on behalf of the Nationwide Class)**
**(As to All Defendants)**

180.     Plaintiff incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

181.      Plaintiff asserts this Count individually and on behalf and the Nationwide Class.

182.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

183.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

184.     Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

185.     Defendants are considered a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

186.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

187.     Defendants' warranties are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

188.     Defendants breached the express warranties by:

a.     Providing a 3 year/36,000-mile Basic Limited Warranty with the purchase or lease of all new Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

b.     Selling and leasing Class Vehicles with the Defect, and which thus were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c.     Refusing and/or failing to honor the express warranties by effectively repairing the Engine Defect free of charge and within a reasonable time.

189.    Defendants provided Plaintiff and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

190.    Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiff and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect and/or a manufacturing workmanship and materials defect in that they are equipped with engines prone to oil starvation resulting from contaminants, such as RTV, which can lead to complete engine failure.

191.    In its capacity as a warrantor, as Defendants had knowledge of the defects in the Class Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage

of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

192.    The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendants and Plaintiff and the other Class members, as, at the time of purchase and lease, Plaintiff and the other Class members had no other options for purchasing warranty coverage other than directly from Defendants.

193.    The limitations on the warranties are substantively unconscionable. Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendants failed to disclose these defects to Plaintiff and the other Class members. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

194.    Plaintiff and each of the other Class members have had sufficient direct dealings with either Defendants or their agents (dealerships) to establish privity of contract. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.

195.    Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

196.    Furthermore, affording either Defendants an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or were reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design defect or the defect caused through workmanship and materials. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resorts to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

197.    Moreover, Defendants received reasonable notice of Plaintiff's nationwide breach of warranty claims on October 5, 2023 and October 10, 2023, when Plaintiff mailed notice letters to Defendants.

198.    Plaintiff and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class members have not re-accepted their Class Vehicles by retaining them.

199.    As a direct and proximate cause of Defendants' breach of the written warranties, Plaintiff and the other Class members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiff and the other Class members, who are entitled to recover actual damages, consequential damages, specific performance, overpayment and diminution in value damages, and costs, including statutory attorneys' fees, and/or other relief as deemed appropriate.

200.    The amount in controversy of Plaintiff's individual claims meet or exceed the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of the other Class members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and the other Class members in connection with the commencement and prosecution of this action.

201.    Further, Plaintiff and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Plaintiff also seeks available declaratory relief. Based on Defendants' continuing failure to fix the known defects, Plaintiff seeks declarations that:

a.      The Class Vehicles are defective in that their vehicles' engines are prone to oil starvation and/or loss of oil film, which can lead to complete engine failure. The Engine Defect may not manifest until after the warranty provided by Defendants has expired. The Defect is material and requires disclosure to all Class Members.

b.      All Class Members are to be provided the best practicable notice of the Defect, which cost shall be borne by Defendants.

c.      Because the Class Vehicles have the Engine Defect, and because Defendants knew of this Defect before the time of sale or lease, Defendants' warranties are insufficient to remediate the defects known by Defendants to exist. Therefore, Defendants' existing warranties, limited to three years or 36,000 miles, are invalid, and, as such, that limitation

is unenforceable. Defendants shall provide notice to all persons covered by that warranty of the removal of this time limitation.

      d.     Defendants shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the Engine Defect in the Class Vehicles.

      e.     Defendants shall establish a repair program and protocol to be communicated to Class members, which will require Defendants to inspect, upon request, a Class member's vehicle to determine whether the Engine Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties.

202.    Plaintiff also requests, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Engine Defect in her vehicle. Such expenses and losses will continue as Plaintiff and Class members must take time off from work, pay for rental cars or other transportation arrangements, childcare, and the myriad expenses involved in going through the repair or replacement process.

203.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendants' conduct presents common questions of law. Equity and fairness require the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## COUNT II
### Fraudulent Concealment
**(Individually and on behalf of the Nationwide Class)**
**(As to All Defendants)**

204.    Plaintiff incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

205.    Plaintiff asserts this Count individually and on behalf and the Nationwide Class.

206.    Defendants concealed and suppressed material facts concerning the Class Vehicles.

207.    As described above, Defendants made material omissions regarding the Class Vehicles.

208.    The vehicle purchased or leased by Plaintiff was, in fact, defective, unsafe and unreliable, because the vehicle was subject to unexpected engine failure due to the Engine Defect.

209.    Defendants had a duty to disclose that this vehicle was defective, unsafe, and unreliable in that the vehicle was subject to unexpected engine failure, because Plaintiff relied on Defendants' representations that the vehicle she was purchasing and retaining was safe and free from defects.

210.    The aforementioned concealment was material, because if it had been disclosed Plaintiff would not have bought, leased, or retained his vehicle.

211.    The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. Defendants intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

212.    Plaintiff relied on Defendants' reputation-along with their failure to disclose the Defect and Defendants' affirmative assurances that their vehicles were safe and reliable and other similar false statements – in purchasing, leasing, or retaining the Class Vehicles.

213.    However, Defendants concealed and suppressed material facts concerning the culture of Defendants – cultures that emphasized cost-cutting, avoidance of dealing with safety issues and a shoddy design and manufacturing process.

214.    Further, Defendants had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiff and the Classes. As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability, and value of the Class Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.

**COUNT III**
**Unjust Enrichment**
**(Individually and on behalf of the Nationwide Class)**
**(As to All Defendants)**

215.    Plaintiff incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

216.     Plaintiff asserts this Count individually and on behalf of the Nationwide Class.

217.    Defendants made affirmative representations to Plaintiff and Nationwide Class Members including that its Class Vehicles were durable, reliable, and dependable. These affirmations of fact became part of the basis of the bargain and thus created an express warranty that the Class Vehicles conformed to Defendants' affirmations of fact.

218.    Defendants knew that the Class Vehicles were not durable, reliable, or dependable due to the Engine Defect, which makes the Class Vehicles prone to oil starvation leading to complete engine failure.

219.    Plaintiff and the members of the Nationwide Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicles possessed the Engine Defect, contrary to Defendants' representations about the durability, reliability, and dependability of the vehicles.

220.    Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff and Nationwide Class members, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. Defendants were also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiff and the Nationwide Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent Defendants' affirmative misrepresentations and material omissions.

221.    Plaintiff and members of the Nationwide Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of Defendants' profits.

**B.    Claims Brought on Behalf of the Arkansas Class**

**COUNT IV**
**Violations of the Arkansas Deceptive Trade Practices Act**
**Ark. Code Ann §§ 4-88-101, *et seq*.**
**(Individually and on behalf of the Arkansas Class)**
**(As to All Defendants)**

222.    Plaintiff incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

223.    Plaintiff asserts this Count individually and on behalf and the Arkansas Class.

224.    Defendants, Plaintiff, and the other Class members are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas ADTPA"), Ark. Code Ann. § 4-88-102(5).

225.    The Class Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

226.    The Arkansas ADTPA, prohibits "[e]ngaging in any [] unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception,

fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108.

227.     By the conduct described in detail above and incorporated herein, Defendants engaged in unfair or deceptive acts in violation of Ark. Code Ann. § 4-88-107(a)(10).

228.     Defendants' conduct proximately caused injuries to Plaintiff and the other Arkansas Class members.

229.     Plaintiff and the other Arkansas Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiff and the other Arkansas Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Subaru's misrepresentations, fraud, deceptive practices, and omissions.

230.     Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

231.     Plaintiff and the Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiff and the Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind. Indeed, Defendants carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

232.     Plaintiff also seek attorneys' fees and any other just and proper relief available.

233.     Pursuant to Ark. Code Ann. § 4-88-101, Plaintiff and the other Class members seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages, treble damages, and any other just and proper relief available under the ADTPA.

234.     Plaintiff provided Defendants with written notice on October 5, 2023 and October 10, 2023, when Plaintiff mailed notice letters to Defendants.

**COUNT V**
**BREACH OF EXPRESS WARRANTY**
**Ark. Code Ann. § 4-2A-210**
**(Individually and on behalf of the Arkansas Class)**
**(As to All Defendants)**

235.     Plaintiff incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

236.     Plaintiff asserts this Count individually and on behalf and the Arkansas Class.

237.     Defendants are and were at all relevant times a "merchant" with respect to motor vehicles under Ark. Code Ann § 4-2-104(1) and a "seller" of motor vehicles under § 4-2-103(1)(d).

238.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann §§ 4-2A-13(1)(h).

239.     In its Limited Warranty, Defendants expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.

240.     Defendants' Limited Warranties formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

241.     Defendants breached the express warranty by failing to timely and adequately repair the Engine Defect.

242.     Further, to the extent that the Limited Warranty is construed to be limited to vehicle defects related to materials or workmanship, Defendants have breached the Limited Warranty.

243.     The Engine Defect is a uniform defect that is related to the manufacturing process (application of RTV) or materials (inadequate RTV).

244.     Defendants have not repaired, and have been unable to repair, the Engine Defect.

245.     Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

246.     Accordingly, recovery by Plaintiff and the other Class members are not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

247.     Also, as alleged in more detail herein, at the time that Defendants warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Defendants improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

248.     Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Defendants' improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

249.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

250.    Plaintiff provided Defendants with written notice on October 5, 2023 and October 10, 2023, when Plaintiff mailed notice letters to Defendants.

**COUNT VI**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Ark. Code Ann. §§ 4-2-314 and 4-2A-212**
**(Individually and on behalf of the Arkansas Class)**
**(As to All Defendants)**

251.    Plaintiff incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

252.    Plaintiff asserts this Count individually and on behalf and the Arkansas Class.

253.    Defendants are merchants with respect to motor vehicles within the meaning of the Ark. Code Ann. §§ 4-2-314. 488. Under Ark. Code Ann. § 4-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Class purchased or leased their Class Vehicles from Subaru.

254.    The Class Vehicles, when sold and at all times, thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

255.    Defendants marketed the Class Vehicles as safe, reliable, and high-quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Arkansas Class members' decisions to purchase the Class Vehicles.

256.    Plaintiff and other Arkansas Class members purchased the Class Vehicles from Defendants, or through Defendants' authorized agents for retail sales. At all relevant times, Defendants were the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles.

257.    Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

258.    Because of the Engine Defect, the Class Vehicles were not in merchantable condition when sold and were not fit for the ordinary purpose of providing safe and reliable transportation.

259.    Defendants knew about the Defect in the Class Vehicles, allowing Defendants to cure their breach of warranty if it chose to do so.

260.    Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiff and other Arkansas Class members. Among other things, Plaintiff and other Arkansas Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Arkansas Class members, and Defendants knew of the defect at the time of sale.

261.    Moreover, the disclaimer was not conspicuous. Rather, it is buried in the manual without bold font and it blends in with the other text in the manual.

262.    Plaintiff and Arkansas Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Affording Defendants a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

263.    Plaintiff sent Defendants notice, as alleged above. Defendants were also provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

264.    As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

**COUNT VII**
**FRAUDULANT CONCEALEMENT/OMISSION**
**Ark. Code Ann. § 4-8-108(2)**
**(Individually and on behalf of the Arkansas Class)**
**(As to All Defendants)**

265.    Plaintiff incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

266.    Plaintiff asserts this Count individually and on behalf and the Arkansas Class.

267.    Defendants intentionally concealed the fact that the Class Vehicles contained the Engine Defect and were prone to complete engine failure. Defendants acted with reckless disregard for the truth and denied Plaintiff and the Arkansas Class information that is highly relevant to their purchasing decision.

268.    The Monroney sticker, which was provided to every person who purchased or leased the Class Vehicles, omits the Defect. Defendants materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the Engine Defect.

269.    Defendants further affirmatively misrepresented and omitted to Plaintiff and the Arkansas Class in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle had no significant defects and were reliable vehicles.

270.    Defendants knew these representations were false when made.

271.     Defendants had a duty to disclose that the Class Vehicles were prone to oil pressure loss causing engine failure.

272.     As alleged in this Complaint, Defendants have held out that the Class Vehicles were free of defect at all relevant times. Defendants intentionally failed to disclose the important facts concerning the Engine Defect, making other disclosures about the engine reliability deceptive.

273.     The truth about the Engine Defect and the Class Vehicles being prone to engine failure caused by oil starvation was known only to defendants; Plaintiff and the Arkansas Class did not of these facts and Defendants actively concealed these facts from Plaintiff and the Arkansas Class.

274.     Plaintiff and the Arkansas Class reasonably relied upon Defendants' deception. They had no way of knowing that Defendants' representations were false and/or misleading. As consumers Plaintiff and the Arkansas Class did not, and could not, unravel Defendants' deception on their own. Rather, Defendants intended to deceive Plaintiff and the Arkansas Class by concealing the true facts about the engine and the Engine Defect.

275.     Defendants' false representations and omissions were material to consumers because they concerned the reliability of the engines, and also because the representations played a significant role in the value of the vehicles. As defendants well knew, its customers, including Plaintiff and the Arkansas Class, highly valued that the engines of the vehicles they were purchasing or leasing were reliable, and they paid accordingly.

276.     Defendant had a duty to disclose the Engine Defect because the details of the true facts were known and/or accessible only to Defendants. Defendants had excusive knowledge as to the facts and knew these facts were not known to or reasonably discoverable to Plaintiff or the Arkansas Class. Defendants also had a duty to disclose because it made general affirmative

representations about the quality of its vehicles with respect to engine reliability, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the Engine Defect. Having volunteered to provide information to Plaintiff and the Arkansas Class, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts are material because they directly impact the value of the Class Vehicles purchased by Plaintiff and the Arkansas Class. Whether a vehicle's engine is prone to failure is a material concern to a consumer. Defendants represented to Plaintiff and the Arkansas Class that they were purchasing or leasing reliable engines, when in fact the Class Vehicles do not perform as advertised and certified to the extent that the engines are prone to oil starvation causing total engine failure.

277.   Defendants have still not made full and adequate disclosures and continue to defraud Plaintiff and the Arkansas Class by concealing material information regarding the Engine Defect in the Class Vehicles.

278.   Plaintiff and the Arkansas Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Class Vehicles, and/or would had taken other affirmative steps in light of the information concealed from them.

279.   Accordingly, as a direct and proximate result of Defendants' actions, Defendants are liable to Plaintiff and the Arkansas Class for damages in an amount to be proven at trial, which shall conclude, but is not limited to, all compensatory damages, incidental, and consequential damages, and other damages allowed by law.

280.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Arkansas Class members' rights and

the representations that Defendants made to them were made in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT X**
**UNJUST ENRICHMENT**
**Ark. Code Ann. § 4-75-606**
**(Individually and on behalf of the Arkansas Class)**
**(As to All Defendants)**

281.    Plaintiff incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

282.     Plaintiff asserts this Count individually and on behalf and the Arkansas Class.

283.    Defendants received and retained a benefit from the Plaintiff and other Class members and inequity has resulted.

284.    Defendants benefitted from selling and leasing the Class Vehicles for more than they were worth as a result of Defendants' actions, at a profit, and Plaintiff and Class members have overpaid for the Class Vehicles and been forced to pay other costs.

285.    Thus, all Plaintiffs and Class members conferred a benefit on Defendants.

286.    It is inequitable for Defendants to retain these benefits.

287.    Plaintiff and Class members were not aware of the true facts about the Class Vehicles prior to purchase or lease and did not benefit from Defendants' conduct.

288.    Defendants knowingly accepted the benefits of its unjust conduct. And, as a result of Defendants' conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

289.    Plaintiff, therefore, seeks an order requiring Defendants to make restitution to her and the other members of the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully request the Court to enter judgment in favor of Plaintiff and the Class and against Defendants, and grant the following relief:

A.      An order certifying the proposed Class and/or Arkansas Class designating the named Plaintiff as Class Representative of the relevant classes and designating the undersigned as Class Counsel for all classes;

B.      A declaration that the Engines in all Class Vehicles are defective;

C.      A declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles.

D.      An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles;

E.      An award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, including overpayment and diminution in value damages, as well as punitive damages, in an amount to be proven at trial;

F.      An award to Plaintiff and Class Members for the return of the purchase price of the Class Vehicles, with interest from the time it was paid, the reimbursement of the reasonable expenses occasioned by the sale, and damages;

G.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket expenses and damages claims associated with the defective Engines in Plaintiff's and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the defective Engines;

H.     A declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

I.     An award of attorneys' fees and costs, as allowed by law;

J.     An award of pre-judgment and post-judgment interest, as provided by law;

K.     Leave to amend this Complaint to conform to the evidence produced at trial; and

L.     Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff hereby demands a jury trial as to all issues triable by a jury.

Dated: July 1, 2024                                    Respectfully submitted,

*/s/ James E. Cecchi*
James E. Cecchi
Jordan M. Steele (*pro hac vice forthcoming*)
Jason H. Alperstein (*pro hac vice forthcoming*)
**CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

W. Daniel "Dee" Miles, III(*pro hac vice forthcoming*)
H. Clay Barnett, III (*pro hac vice forthcoming*)
Demet Basar (NJ-039951990)
J. Mitch Williams (*pro hac vice forthcoming*)
Dylan T. Martin (*pro hac vice forthcoming*)
Trent H. Mann (*pro hac vice forthcoming*)
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343

Dee.Miles@BeasleyAllen.com
Clay.Barnett@BeasleyAllen.com
Demet. Basar@BeasleyAllen.com
Mitch.Williams@BeasleyAllen.com
Dylan.Martin@BeasleyAllen.com
Trent.Mann@BeasleyAllen.com

*Attorneys for Plaintiffs and the Proposed
Classes*